# KENTUCKY WHIP & COLLAR CO. *v.* ILLINOIS CENTRAL RAILROAD CO.

No. 138.  Argued November 20, 1936.—Decided January 4, 1937.

Mr. *Charles I. Dawson,* with whom *Mr. A. Shelby Winstead* was on the brief, for petitioner.

336

338

Mr. *Blakey Helm,* with whom *Messrs. John C. Doolan, E. C. Craig,* and *Charles N. Burch* were on the brief, for respondent.

*Assistant Attorney General Dickinson,* with whom *Solicitor General Reed* and *Mr. Hugh B. Cox* were on the brief, for the United States, as *amicus curiae,* by special leave of Court.

340

342

By leave of Court, briefs of *amici curiae* were filed by *Messrs. John J. Bennett, Jr.,* Attorney General of New York, and *Henry Epstein,* Solicitor General, on behalf of the State of New York; *Messrs. Harry B. Hawes, Raymond A. Walsh,* and *Bon Geaslin,* on behalf of the Cordage Institute and the American Federation of Labor; and *Mr. Harry H. Peterson,* Attorney General of Minnesota, on behalf of the State of Minnesota, all in support of the validity of the Ashurst-Sumners Act.

MR. CHIEF JUSTICE HUGHES delivered the opinion of the Court.

This controversy relates to the constitutional validity of the Act of Congress of July 24, 1935, known as the Ashurst-Sumners Act. 49 Stat. 494.

The Act makes it unlawful knowingly to transport in interstate or foreign commerce goods made by convict labor into any State where the goods are intended to be received, possessed, sold, or used in violation of its laws. Goods made by convicts on parole or probation, or made in federal penal and correctional institutions for use by the Federal Government, are excepted. Packages containing convict-made goods must be plainly labeled so as to show the names and addresses of shipper and consignee, the nature of the contents, and the name and

location of the penal or reformatory institution where produced.[1] Violation is punished by fine and forfeiture.[2]

Petitioner manufactures in Kentucky, with convict labor, horse collars, harness and strap goods which it markets in various States. It tendered to respondent, a common carrier, twenty-five separate shipments for transportation in interstate commerce, of which ten were consigned to customers in States whose laws prohibited the

[1] Sections 1 and 2 are as follows:

"That it shall be unlawful for any person knowingly to transport or cause to be transported, in any manner or by any means whatsoever, or aid or assist in obtaining transportation for or in transporting any goods, wares, and merchandise manufactured, produced, or mined wholly or in part by convicts or prisoners (except convicts or prisoners on parole or probation), or in any penal or reformatory institution, from one State, Territory, Puerto Rico, Virgin Islands, or District of the United States, or place noncontiguous but subject to the jurisdiction thereof, or from any foreign country, into any State, Territory, Puerto Rico, Virgin Islands, or District of the United States, or place noncontiguous but subject to the jurisdiction thereof, where said goods, wares, and merchandise are intended by any person interested therein to be received, possessed, sold, or in any manner used, either in the original package or otherwise in violation of any law of such State, Territory, Puerto Rico, Virgin Islands, or District of the United States, or place noncontiguous but subject to the jurisdiction thereof. Nothing herein shall apply to commodities manufactured in Federal penal and correctional institutions for use by the Federal Government.

"Sec. 2. All packages containing any goods, wares, and merchandise manufactured, produced, or mined wholly or in part by convicts or prisoners, except convicts or prisoners on parole or probation, or in any penal or reformatory institution, when shipped or transported in interstate or foreign commerce shall be plainly and clearly marked, so that the name and address of the shipper, the name and address of the consignee, the nature of the contents, and the name and location of the penal or reformatory institution where produced wholly or in part may be readily ascertained on an inspection of the outside of such package."

[2] *Id.*, §§ 3 and 4.

sale of convict-made goods within their respective borders, five to States whose laws did not prohibit such sale but required that the goods should be plainly marked so as to show that they were made by convicts, and the remaining ten to States whose laws imposed no restriction upon sale or possession. None of the packages were labeled as required by the Act of Congress and, in obedience to the Act, respondent refused to accept the shipments.

Petitioner then brought this suit for a mandatory injunction to compel the transportation. The District Court dismissed the bill and the Circuit Court of Appeals affirmed the decree. The District Court declared the Act to be invalid so far as it prohibited transportation of convict-made goods into States which proscribed sale or possession, but sustained the provision which required labeling. 12 F. Supp. 37. The Circuit Court of Appeals sustained the Act in its entirety. 84 F. (2d) 168. This Court granted certiorari.

Petitioner contends (1) that the Congress is without constitutional authority to prohibit the movement in interstate commerce of useful and harmless articles made by convict labor and (2) that the Congress has no power to exclude from interstate commerce convict-made goods which are not labeled as such.

*First.* The commerce clause (Art. I, § 8, par. 3) confers upon the Congress "the power to regulate, that is, to prescribe the rule by which commerce is to be governed." This power "is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations, other than are prescribed in the constitution." *Gibbons* v. *Ogden,* 9 Wheat. 1, 196. By the Act now before us, the Congress purports to establish a rule governing interstate transportation, which is unquestionably interstate commerce. The question is whether this rule goes beyond the authority to "regulate."

Petitioner's argument necessarily recognizes that in certain circumstances an absolute prohibition of interstate transportation is constitutional regulation. The power to prohibit interstate transportation has been upheld by this Court in relation to diseased livestock,[3] lottery tickets,[4] commodities owned by the interstate carrier transporting them, except such as may be required in the conduct of its business as a common carrier,[5] adulterated and misbranded articles, under the Pure Food and Drugs Act,[6] women, for immoral purposes,[7] intoxicating liquors,[8] diseased plants,[9] stolen motor vehicles,[10] and kidnaped persons.[11]

The decisions sustaining this variety of statutes disclose the principles deemed to be applicable. We have frequently said that in the exercise of its control over interstate commerce, the means employed by the Con-

[3] Act of May 29, 1884, 23 Stat. 31; *Reid* v. *Colorado,* 187 U. S. 137. See *Champion* v. *Ames,* 188 U. S. 321, 358, 359.

[4] Act of March 2, 1895, 28 Stat. 963; *Champion* v. *Ames,* 188 U. S. 321.

[5] Act of June 29, 1906, 34 Stat. 584; *United States* v. *Delaware & Hudson Co.,* 213 U. S. 366, 415.

[6] Act of June 30, 1906, 34 Stat. 768; *Hipolite Egg Co.* v. *United States,* 220 U. S. 45; *Seven Cases* v. *United States,* 239 U. S. 510.

[7] Act of June 25, 1910, 36 Stat. 825; *Hoke* v. *United States,* 227 U. S. 308; *Caminetti* v. *United States,* 242 U. S. 470.

[8] Act of March 1, 1913, 37 Stat. 699; Act of March 3, 1917, 39 Stat. 1069; *Clark Distilling Co.* v. *Western Maryland Ry. Co.,* 242 U. S. 311; *United States* v. *Hill,* 248 U. S. 420; *McCormack & Co.* v. *Brown,* 286 U. S. 131.

[9] Act of March 4, 1917, 39 Stat. 1165; *Oregon-Washington R. & N. Co.* v. *Washington,* 270 U. S. 87.

[10] Act of October 29, 1919, 41 Stat. 324; *Brooks* v. *United States,* 267 U. S. 432.

[11] Act of June 22, 1932, 47 Stat. 326; Act of May 18, 1934, 48 Stat. 781; *Gooch* v. *United States,* 297 U. S. 124.

See, also, Act of May 25, 1900, 31 Stat. 187; *Rupert* v. *United States,* 181 Fed. 87; Act of July 3, 1918, 40 Stat. 755; *Bogle* v. *White,* 61 F. (2d) 930.

gress may have the quality of police regulations. *Gloucester Ferry Co.* v. *Pennsylvania,* 114 U. S. 196, 215; *Hoke* v. *United States,* 227 U. S. 308, 323; *Seven Cases* v. *United States,* 239 U. S. 510, 515. The power was defined in broad terms in *Brooks* v. *United States,* 267 U. S. 432, 436, 437: "Congress can certainly regulate interstate commerce to the extent of forbidding and punishing the use of such commerce as an agency to promote immorality, dishonesty or the spread of any evil or harm to the people of other States from the State of origin. In doing this it is merely exercising the police power, for the benefit of the public, within the field of interstate commerce."

The anticipated evil or harm may proceed from something inherent in the subject of transportation as in the case of diseased or noxious articles, which are unfit for commerce. *Hipolite Egg Co.* v. *United States,* 220 U. S. 45; *Oregon-Washington R. & N. Co.* v. *Washington,* 270 U. S. 87, 99. Or the evil may lie in the purpose of the transportation, as in the case of lottery tickets, or the transportation of women for immoral purposes. *Champion* v. *Ames,* 188 U. S. 321, 358; *Hoke* v. *United States, supra; Caminetti* v. *United States,* 242 U. S. 470, 486. The prohibition may be designed to give effect to the policies of the Congress in relation to the instrumentalities of interstate commerce, as in the case of commodities owned by interstate carriers. *United States* v. *Delaware & Hudson Co.,* 213 U. S. 366, 415. And, while the power to regulate interstate commerce resides in the Congress, which must determine its own policy, the Congress may shape that policy in the light of the fact that the transportation in interstate commerce, if permitted, would aid in the frustration of valid state laws for the protection of persons and property. *Brooks* v. *United States, supra; Gooch* v. *United States,* 297 U. S. 124.

The contention is inadmissible that the Act of Congress is invalid merely because the horse collars and harness

which petitioner manufactures and sells are useful and harmless articles. The motor vehicles, which are the subject of the transportation prohibited in the National Motor Vehicle Theft Act,[12] are in themselves useful and proper subjects of commerce, but their transportation by one who knows they have been stolen is "a gross misuse of interstate commerce" and the Congress may properly punish it "because of its harmful result and its defeat of the property rights of those whose machines against their will are taken into other jurisdictions." *Brooks* v. *United States, supra,* p. 439. Similarly, the object of the Federal Kidnaping Act [13] is to aid in the protection of the personal liberty of one who has been unlawfully seized or carried away. *Gooch* v. *United States, supra;* compare *United States* v. *Wheeler,* 254 U. S. 281.

On the same general principle, the Congress may prevent interstate transportation from being used to bring into a State articles the traffic in which the State has constitutional authority to forbid, and has forbidden, in its internal commerce. In that view, we sustained the acts of Congress designed to prevent the use of interstate transportation to hamper the execution of state policy with respect to traffic in intoxicating liquors. This was not because intoxicating liquors were not otherwise legitimate articles of commerce. On the contrary they were recognized as such "by the usages of the commercial world, the laws of Congress and the decisions of courts." *Leisy* v. *Hardin,* 135 U. S. 100, 110; *In re Rahrer,* 140 U. S. 545, 556; *Louisville & Nashville R. Co.* v. *Cook Brewing Co.,* 223 U. S. 70, 82. It was because intoxicating liquors were legitimate subjects of commercial intercourse that the States were powerless to interfere with their transportation in interstate commerce. *Bowman* v. *Chicago & Northwestern Ry. Co.,* 125 U. S. 465, 489; *Leisy* v. *Hardin,*

---

[12] See Note 10.
[13] See Note 11.

*supra,* pp. 110, 113; *Rhodes* v. *Iowa,* 170 U. S. 412; *Vance* v. *W. A. Vandercook Co.* (No. 1), 170 U. S. 438; *Louisville & Nashville R. Co.* v. *Cook Brewing Co., supra.* But because of the effects ascribed to the traffic in intoxicating liquors, the States in the exercise of their police power in relation to their internal commerce could restrict or interdict that traffic without violating the Federal Constitution. *Foster* v. *Kansas,* 112 U. S. 201, 206; *Mugler* v. *Kansas,* 123 U. S. 623, 657–659. To aid the States in securing the full protection they desired, Congress brought into play its power to regulate interstate commerce.

By the Wilson Act of August 8, 1890,[14] intoxicating liquors transported into any State were subjected upon arrival to the operation of state laws to the same extent as though they had been produced within the State, although still in the original packages. This act was upheld in *In re Rahrer, supra.* But the statute did not apply until the transportation was completed by actual delivery to the consignee. *Rhodes* v. *Iowa, supra,* p. 426; *Adams Express Co.* v. *Kentucky,* 214 U. S. 218, 222; *Louisville & Nashville R. Co.* v. *Cook Brewing Co., supra.* As "the right to receive" was not affected by the Wilson Act, "such receipt and the possession following from it and the resulting right to use" remained protected by the commerce clause. *Clark Distilling Co.* v. *Western Maryland Ry. Co.,* 242 U. S. 311, 323. In this situation the Congress passed the Webb-Kenyon Act of March 1, 1913,[15] which prohibited the transportation of intoxicating liquors into any State when it was intended that they should be "received, possessed, sold, or in any manner used," in violation of its laws. The Court upheld the constitutional validity of this Act as a regulation of interstate commerce. *Clark Distilling Co.* v. *Western Maryland Ry. Co., supra.* It was

[14] 26 Stat. 313.
[15] 37 Stat. 699.

supplemented by the Act of March 3, 1917, known as the Reed Amendment.[16]   *United States* v. *Hill,* 248 U. S. 420, 424.

The ruling in *Hammer* v. *Dagenhart,* 247 U. S. 251, upon which petitioner relies, in no way contravenes or limits the principle of these decisions.   In the *Hammer* case, the Court concluded that the Act of Congress there under consideration had as its aim the placing of local production under federal control.  *Id.,* pp. 271, 272.  Far from disapproving the decisions we have cited, the Court expressly recognized their authority.   "In each of these instances," the Court said, "the use of interstate transportation was necessary to the accomplishment of harmful results.   In other words, although the power over interstate transportation was to regulate, that could only be accomplished by prohibiting the use of the facilities of interstate commerce to effect the evil intended."  *Id.* And within a few months after the *Hammer* case, the Court in *United States* v. *Hill, supra,* emphatically reiterated the doctrine of these cases and, in particular, that of *Clark Distilling Co.* v. *Western Maryland Ry. Co.,* sustaining the Webb-Kenyon Act.

The course of congressional legislation with respect to convict-made goods has followed closely the precedents as to intoxicating liquors.   By the Hawes-Cooper Act of January 19, 1929,[17] the Congress provided that convict-made goods (with certain exceptions) transported into any State should be subject upon arrival, whether in the original packages or otherwise, to the operation of state laws as if produced within the State.   In *Whitfield* v. *Ohio,* 297 U. S. 431, petitioner was charged in the state court in Ohio with selling convict-made goods in violation of the state law.   It appeared that the goods had been sold in the original packages as shipped in interstate com-

[16] 39 Stat. 1069.
[17] 45 Stat. 1084.

merce and that there was "nothing harmful, injurious or deleterious" about them. But this Court said that the view of the State of Ohio, that the sale of convict-made goods in competition with the products of free labor was an evil, found ample support in fact and in the similar legislation of a preponderant number of other States. The Court observed that the Congress had prohibited the importation of the products of convict labor.[18] All such legislation, state and federal, proceeded upon the view "that free labor, properly compensated, cannot compete successfully with the enforced and unpaid or underpaid convict labor of the prison." The Court upheld the power of the State, so far as the Federal Constitution is concerned, to base nondiscriminatory legislation upon that conception, and as it appeared that the Ohio statute would be unassailable if made to take effect after sale in the original package, the statute was held to be equally unassailable in the light of the provisions of the Hawes-Cooper Act. As to the validity of the latter Act, the Court followed the decision in *In re Rahrer, supra,* in relation to the Wilson Act.

The Ashurst-Sumners Act as to interstate transportation of convict-made goods has substantially the same provisions as the Webb-Kenyon Act as to intoxicating liquors and finds support in similar considerations. The subject of the prohibited traffic is different, the effects of the traffic are different, but the underlying principle is the same. The pertinent point is that where the subject of commerce is one as to which the power of the State may constitutionally be exerted by restriction or prohibition in order to prevent harmful consequences, the Congress may, if it sees fit, put forth its power to regulate interstate commerce so as to prevent that commerce from being used to impede the carrying out of the state policy.

---

[18] Act of June 17, 1930, 46 Stat. 689.

In the congressional action there is nothing arbitrary or capricious bringing the statute into collision with the requirements of due process of law. The Congress in exercising the power confided to it by the Constitution is as free as the States to recognize the fundamental interests of free labor.[19] Nor has the Congress attempted to delegate its authority to the States. The Congress has not sought to exercise a power not granted or to usurp the police powers of the States. It has not acted on any assumption of a power enlarged by virtue of state action. The Congress has exercised its plenary power, which is subject to no limitation other than that which is found in the Constitution itself. The Congress has formulated its own policy and established its own rule. The fact that it has adopted its rule in order to aid the enforcement of valid state laws affords no ground for constitutional objection.

*Second.* As the Congress could prohibit the interstate transportation of convict-made goods as provided in section one of the Act, the Congress could require packages

---

[19] In the report of the Committee on the Judiciary of the Senate, recommending the passage of the Ashurst-Sumners Act, the Committee said (Sen. Rep. No. 906, 74th Cong., 1st sess.):

"For many years the Congress has considered bills relating to the sale of prison-made goods. Extensive hearings have been held on these measures which have thoroughly revealed the evils attending the sale of such goods, in the open market, in competition with goods manufactured and produced by free labor. These evils impelled the Congress in 1929 to enact the Hawes-Cooper law, by virtue of which prison-made goods, upon their entry and delivery into a State, became subject to the laws of that State.

"At present 21 States, with a population in excess of 75 millions, have enacted laws prohibiting the sale, in the open market, of prison-made goods. This bill is designed to prohibit the transportation of such goods into the States which have thus legislated, in cases in which such goods are to be received or used in violation of the State law. The principle involved in this bill has been frequently sustained by the Supreme Court of the United States."

containing convict-made goods to be labeled as required by section two. The requirement of labels, disclosing the nature of the contents, the name and location of the penal institution where the goods were produced, and the names and addresses of shippers and consignees, was manifestly reasonable and appropriate for the carrying out of the prohibition. *Seven Cases* v. *United States, supra; United States* v. *Freeman,* 239 U. S. 117; *Weeks* v. *United States,* 245 U. S. 618, 622. The fact that the labeling was required in all shipments of convict-made goods, regardless of the law of the State of destination, does not invalidate the provision, as its scope could reasonably be deemed to be necessary to accomplish the legitimate purpose of the Act. *Otis* v. *Parker,* 187 U. S. 606, 609; *New York ex rel. Silz* v. *Hesterberg,* 211 U. S. 31, 40; *Purity Extract Co.* v. *Lynch,* 226 U. S. 192, 201; *Everard's Breweries* v. *Day,* 265 U. S. 545, 560.

The decree is

*Affirmed.*

MR. JUSTICE STONE took no part in the consideration or decision of this case.