HOLLAND, Administrator of the Wage and Hour Division, United States Department of Labor, v. HAILE GOLD MINES, Inc.

No. 288.

District Court, W. D. South Carolina, Rock Hill Division.

April 23, 1942.

George A. Downing, Regional Atty., Department of Labor, and William A. Lowe, Atty., Department of Labor, both of Atlanta, Ga., for plaintiff.

Donald Russell, of Spartanburg, S. C., D. W. Robinson, Jr., of Columbia, S. C., and R. S. Stewart, of Lancaster, S. C., for defendant.

WYCHE, District Judge.

Plaintiff, Administrator of the Wage and Hour Division, United States Department of Labor, seeks in this action to enjoin defendant, Haile Gold Mines, Inc., from violation of the provisions of Section 15 (a) (1) and (2) of the Fair Labor Standards Act, Act of June 25, 1938, 52 Stat. 1060, 29 U.S.C.A. § 201 et seq. The matter now comes before me upon motion of the plaintiff for summary judgment on the pleadings and affidavits.

For the purpose of the motion the following facts are admitted: Haile Gold Mines, Inc., operates a gold mine near the City of Kershaw, South Carolina. The employees whose wages are involved in this action are engaged in the digging and crushing of rock from which gold is later extracted. After the gold is obtained, it is delivered to the United States Post Office in Kershaw, South Carolina, and there forwarded to the United States Mint at Philadelphia, Pennsylvania. A United States Treasury check is then issued to the company for the bullion. Defendant operates its gold mine under license issued to it pursuant to the Gold Reserve Act of 1934, 48 Stat. 337. It sells to no one save the United States Mint, and that at the price fixed by the Government.

Under the Gold Reserve Act of 1934 and the Regulations issued pursuant thereto, the United States Treasury purchases all of the gold mined in this country, all of the gold scrap, and gold imported from other nations at a price fixed by the Government. Every mine producing gold must have a license which requires all gold to be shipped to a particular mint and prohibits the retention of any substantial amount of the gold by the mine.

It is admitted by the defendant that the employees here involved now receive for their work an amount which is less than they would receive were the Fair Labor Standards Act applicable. Defendant's contention is that its activities are not subject to the Fair Labor Standards Act.

The production of gold is of itself an intrastate activity. United States v. Darby, 312 U.S. 100, 657, 61 S.Ct. 451, 85 L.Ed. 609, 132 A.L.R. 1430; National Labor Relations Board v. Jones & Laughlin Steel Corp., 1937, 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352; Carter v. Carter Coal Co., 1936, 298 U.S. 238, 56 S.Ct. 855, 80 L.Ed. 1160. Plaintiff contends that this intrastate activity is, however, subject to Federal Regulations under the Fair Labor Standards Act in that it is the production of goods for interstate commerce. The only "commerce" here involved is the acquisition of the gold by the United States, as to which defendant has no choice under the Gold Reserve Act. No shipment in interstate commerce is present, unless it be the forwarding of the gold from the Post Office at Kershaw, South Carolina, to the Mint at Philadelphia, Pennsylvania. Even if the acquisition of the gold by the government be deemed a commercial transaction, the interstate aspect, required for Federal regulation, is not present, inasmuch as the transfer of the gold from Kershaw to Philadelphia is pursuant to the orders of the United States Government; as such it would appear to be an administrative act of the government rather than a shipment in commerce by the defendant mining company. Cf. National Labor R. Board v. Idaho-Maryland M. Corp., 9 Cir., 1938, 98 F.2d 129.

As further bearing upon this point, it has been pointed out that if the Act is deemed to apply to defendant here, then it is by the Act forbidden to do that which under the Gold Reserve Act it is required to do, i. e., send its gold to the government. While in every other instance in which the Court has been asked to apply the Fair Labor Standards Act the employer has the legal choice of complying with the Fair Labor Standards Act and continuing to engage in interstate commerce, or not complying with the Act so long as he does not engage in interstate commerce, in the present case defendant does not have that choice. Under the Gold Reserve Act of 1934, 31 U.S.C.A. § 441, it is required to send its gold where the government directs. This does not seem to me to constitute "engaging in interstate commerce" within the meaning of the Fair Labor Standards Act.

There is an even more fundamental objection to the application of the Fair Labor Standards Act to the defendant in the circumstances of this case. Admittedly the payment of wages by the defendant to its employees who are mining and crushing its ore is an intrastate activity. Although an intrastate activity may be the subject of Federal Regulation under the commerce clause of the Constitution, art. 1, § 8, cl. 3 (Kentucky Whip & Collar Co. v. Illinois C. R. Co., 1937, 299 U.S. 334, 57 S.Ct. 277, 81 L.Ed. 270; United States v. Darby, 312 U.S. 100, 657, 61 S.Ct. 451, 85 L.Ed. 609, 132 A.L.R. 1430; United States v. Wrightwood Dairy Co., 1942, 62 S.Ct. 523, 86 L.Ed. ——), nevertheless every instance of the exercise of this power is in fact a "regulation of interstate commerce", designed to protect the commerce from some evil inherent in that which is regulated, or to keep interstate commerce from being the means employed to spread the evil (cf. the classification of the cases in Kentucky Whip & Collar Co. v. Illinois C. R. Co., 299 U.S. 334, 57 S.Ct. 277, 81 L.Ed. 270; United States v. Darby, 312 U.S. 100, 657, 61 S.Ct. 451, 85 L.Ed. 609, 132 A.L.R. 1430.) The latter is the policy of the Fair Labor Standards Act, as stated in United States v. Darby, supra, 312 U.S. at pages 115 and 122, 61 S.Ct. at page 457, 85 L.Ed. 609, 132 A.L.R. 1430, as follows: "The motive and purpose of the present regulation is plainly to make effective the Congressional conception of public policy that interstate commerce should not be made the instrument of competition in the distribution of goods produced under substandard labor conditions, which competition is injurious to the commerce and to the states from and to which the commerce flows. * * *

"As we have said the evils aimed at by the Act are the spread of substandard labor conditions through the use of the facilities of interstate commerce for competition by the goods so produced with those produced under the prescribed or better labor conditions; and the consequent dislocation of the commerce itself caused by the impairment or destruction of local businesses by competition made ef-

fective through interstate commerce. The Act is thus directed at the suppression of a method or kind of competition in interstate commerce which it has in effect condemned as 'unfair', as the Clayton Act, 38 Stat. 730, has condemned other 'unfair methods of competition' made effective through interstate commerce."

█ It will thus be seen that competition in interstate commerce is the handle by which the Federal Government grasps the regulation of intrastate wages. There is no physical connection between intrastate wages and interstate commerce as is the case with railroads and their safety appliances; here "the nexus * * * is economic and not physical". Federal Trade Comm. v. Bunte Bros. 1931, 312 U.S. 349, 61 S.Ct. 580, 85 L.Ed. 881. If an intrastate activity does not substantially affect interstate commerce, then it is not subject to Federal control. "So too the marketing of a local product in competition with that of a like commodity moving interstate may so interfere with interstate commerce or its regulation as to afford a basis for Congressional regulation of the intrastate activity. It is the effect upon the interstate commerce or its regulation, regardless of the particular form which the competition may take, which is the test of federal power." United States v. Wrightwood Dairy Co., 1942, 62 S.Ct. 523, 526, 86 L.Ed. ——. The "effect upon interstate commerce" caused by low wages is that effect which obtains through the competition of those goods produced by low wage workers with similar goods produced by employers paying a higher wage. United States v. Darby, 1941, 312 U.S. 100, 657, 61 S.Ct. 451, 461, 85 L.Ed. 609, 132 A.L.R. 1430. Competition is the sine qua non of this legally recognized effect. Hence, if there be no competition from the goods produced under substandard wage conditions, there is no effect upon interstate commerce and no basis for Federal regulation. If there is no effect upon interstate commerce, there is nothing to regulate.

█ Gold is unique in that it is one commodity as to which there is an unlimited, and indeed mandatory, single market for every producer, and for which there is only one price, fixed by government order. Producers do not vie with one another either for market or for price. Since low wages by one producer are not reflected in the price at which he sells, they cannot have any effect upon interstate commerce and the price, and as a consequence the wage, of any other producer. The absence of competition, through the fixity of price and through the unlimited character of the one market, insulates each producer and his wages from every other producer and his wages. In the absence of any relation between the wages paid by defendant and interstate commerce, the wages paid by defendant are not within the scope of Federal regulation under the commerce power. Thus, whether the Fair Labor Standards Act represents the exercise by the Federal Government of its fullest power to regulate interstate commerce or not (cf. Eddings v. Southern Dairies, D.C.E.D.S.C. 1942, 42 F.Supp. 664), it cannot apply to an intrastate wage in non-competitive production. Cf. United States v. Darby, 312 U.S. 100, 657, 61 S.Ct. 451, 85 L.Ed. 609, 132 A.L.R. 1430.

Enterprise Box Co. v. Fleming, 5 Cir., 1942, 125 F.2d 897, cited by plaintiff is not in point. The wages there held subject to regulation were those paid in the manufacture of cigar boxes, a competitive rather than a non-competitive industry. Florida Fruit & Produce v. United States, 5 Cir., 1941, 117 F.2d 506, is not applicable to the present case. There the Court held that defendants could not try before a jury the wisdom of the Congressional policy behind the Fair Labor Standards Act. Here, defendant is asserting that its activities fall without the scope of Congressional regulation.

In the light of the decision above, I deem it unnecessary to consider defendant's contention that the application of the Fair Labor Standards Act to it would, under the facts of the case, be a deprivation of its property without due process in violation of the Fifth Amendment.

For the foregoing reasons the injunction sought by the plaintiff should be denied.