**UNITED STATES of America**

v.

**WESTINGHOUSE ELECTRIC CORPORATION.**

**Civ. A. No. 79-774.**

United States District Court,
W. D. Pennsylvania.

Jan. 31, 1980.

Sidney Edelman, Asst. Gen. Counsel, for Dept. of Health, Ed. and Welfare, Rockville, Md., William F. Ward, Asst. U. S. Atty., Pittsburgh, Pa., for plaintiff.

Charles R. Volk, Pittsburgh, Pa., for defendant.

## OPINION

ROSENBERG, District Judge.

The petitioner, United States of America, moves for an order under the Occupational Safety and Health Act of 1970, 29 U.S.C.

§ 657(b)[1] directing the respondent, Westinghouse Electric Corporation, to produce certain documents in accordance with a subpoena duces tecum[2] issued by the Director of the National Institute for Occupational Safety and Health (NIOSH), a division of the Department of Health, Education and Welfare.

The respondent, Westinghouse Electric Corporation, resists compliance with the subpoena duces tecum for the production of personnel records of employees requested by the petitioner on the basis that the employer would be compelled to intrude upon the personal privilege of the employees by divulging such medical records.

The matter came on for hearing before the court without a jury, during which both parties introduced evidence on the issues presented by both parties. Thereupon, briefs were presented by the parties on the issues of law, and after examination of the record and consideration of the evidence presented, I make the following findings of fact thereon.

On February 22, 1978, NIOSH received a written request for a Health Hazard Evaluation from an authorized representative of the employees of the respondent, Westinghouse, at the Trafford, Pennsylvania plant complaining that there was exposure to methyl ethyl ketone and other harmful substances among workers in the "TC–72" and "TC–74" areas. In response, the NIOSH Director, pursuant to 29 U.S.C. § 669(a)(6)[3],

1. § 657(b). "In making his inspections and investigations under this chapter the Secretary may require the attendance and testimony of witnesses and the production of evidence under oath . . ."

2. "Medical records of all employees presently employed in the TC–74 area and the medical records of all employees who formerly worked in the TC–74 area and who now work elsewhere in the plant."

3. § 669(a)(6). The Secretary of Health, Education and Welfare shall publish within six months of December 29, 1970, and thereafter as needed but at least annually a list of all known toxic substances by generic family or other useful grouping, and the concentrations at which such toxicity is known to occur. He shall determine following a written request by any employer or authorized representative of employees, specifying with reasonable particularity the grounds on which the request is made, whether any substance normally found in the place of employment has potentially toxic effects in such concentrations as used or found; and shall submit such determination both to employers and affected employees as soon as possible. If the Secretary of Health, Education, and Welfare determines that any substance is potentially toxic at the concentrations in which it is used or found in a place of employment, and such substance is not covered by an occupational safety or health standard promulgated under section 655 of this title, the Secretary of Health, Education, and Welfare shall immediately submit such determination to the Secretary,* together with all pertinent criteria.

* Secretary of Labor.

commenced an inquiry to determine whether any substance normally found in the specified, complained places of employment had potentially toxic effects in such concentration, as used, upon any employees and accordingly arranged for a site visit.

On April 21, some physicians performed a walkthrough and after their inspection, pursuant to the Standard Health Hazard Evaluation request submitted by the employees' authorized representative, the physicians reported that there were only two areas that were requested to be evaluated, where there was a potential for respiratory problems—the bushing area, TC–72 and the epoxy area, TC–74. They recommended that the exposed people in the TC–74 area undergo further testing, as was essentially performed later by Dr. Thomas Wilcox, a medical officer in the Hazard Evaluation and Technical Assistance Branch of NIOSH. These were the providing of tests for the presence of antibody in the blood to the substance hexahydrophthalic anhydride (referred to as HHPA).

It is necessary that the experts making the study make findings in the HHPA potential causes with allergic reactions in a certain number of individuals exposed to it, which in some individuals caused a condition of asthma, possible occupational asthma induced by chemical exposure received at work. Also, this study would be required to determine whether other chemicals caused occupational asthma syndromes accelerating decrease in a person's ability to breathe. While the effects may be variable from slight to serious, individuals who are allergic to HHPA may gradually develop the syndrome and over a period of time develop breathing difficulties affecting them in their everyday life.

On October 19, Dr. Wilcox and G. Edward Burroughs, an industrial hygienist employed by NIOSH, visited the Westinghouse facility and informed the respondent's Director of Accident Prevention, Gerald Brady, that access would be needed to complete medical records of potentially affected employees working in the complained of areas. While the respondent's representative questioned its right to present NIOSH with the records of the potentially affected employees, certain employees examined during the Health Hazard Evaluation, before and after their work days, indicated that pulmonary function and blood tests had been performed on workers in the TC–74 area.

The employee representative complained of exposure to methyl ethyl ketone and other harmful substances in the specified employment areas. The inquiry by NIOSH's Director was more broadly instituted and was intended to inquire whether any substance normally found in the specified place of employment had potentially toxic effects in such concentration as used in the employment areas as to affect such employees. Thus, while the employees mentioned methyl ethyl ketone, the investigation, must of necessity, have included "other harmful substances."

Methyl ethyl ketone is a "flammable liquid compound $CH_3COC_2H_5$ resembling acetone made usually by dehydrogenation of secondary butyl alcohol and used chiefly as a solvent . . ." Webster's New Third International Dictionary, Unabridged, 1971, at page 1423.

There are evidently twelve ketones,[4] some of which have a wide and varied use in industry, "[C]riteria for a recommended standard . . . Occupational Exposure to Ketones", U.S. Department of Health, Education and Welfare, National Institution for Occupational Safety and Health, document for sale by Superintendent of Documents, United States Government Printing Office, Washington, D.C. 20402.

Thus, the petitioner under law is not here precluded from making its inquiry on any potential hazard to employees on ketone

4. Ketone is not to be confused with Kepone, a pesticide, which was widely publicized by the news media in July, 1976, as being a highly dangerous chemical and which had reportedly leaked into the James River and threatened people for 100 miles about from Richmond, Virginia to Chesapeake Bay. The Pittsburgh Press, July 25, 1976.

alone, but may inquire into other hazardous chemicals which may affect the health of employees in these two areas of the respondent's premises. However, this question has not been raised by the respondent and it needs no further consideration. It is presented only for the purpose of indicating the greater responsibility which the petitioner in this case is required to assume in its study, as authorized and directed by this statute.

It is with the medical records of those employees who were, may now, or in the future be affected and who are, in a sense, clues and facts required by the petitioner to accomplish its study for the purposes which Congress has imposed on it and for such study.

As relates to the personal medical records, the respondent admits that it refused to supply these to the petitioner, without (1) individual employee authorization for such a release, and (2) written government assurance that these records will not be disclosed to third parties—conditions to which the petitioner would not agree. The respondent argues that the subpoena is presently unenforceable because disclosure of such personally identified medical records breaches the constitutionally protected right to privacy of the employees in the absence of employee consent and adequate prohibitions upon further dissemination of the information received. The respondent asserts that NIOSH has not demonstrated authority for the issuance of the subpoena and has not defined its demand with requisite specificity, nor that it has proven that its request for the entire medical records of the potentially affected employees is relevant and not overbroad. Finally, the respondent claims that NIOSH has violated its own regulations governing the conduct of Health Hazard Evaluations by seeking to compel the production of the medical records.

The common law recognizes no physician-patient privilege, nor do the federal courts as a general evidentiary principle. *In re Grand Jury Subpoena*, 460 F.Supp. 150 (W.D.Mo.1978); *Mariner v. Great Lakes Dredge & Dock Co.*, 202 F.Supp. 430 (N.D. Ohio, 1962). If the respondent is to prevail in its objections to the petitioner's subpoena duces tecum, it must do so on pertinent authority of Pennsylvania law, or upon specific holdings by the federal courts. The Pennsylvania statute which relates to the doctor-patient privilege is contained in 28 Purdon's Penn.Stats. § 328.[5] However, that statute relates directly to communications made by a patient to a physician. In *Woods v. National Life and Accident Insurance Co.*, 347 F.2d 760, C.A. 3, 1965, it was held that that statute did not prevent even a doctor from disclosing

"the purpose of his examination, his diagnosis and treatment. The Act applies only to communications made by a patient to a physician in a civil action: *Phillips' Estate*, 295 Pa. 349, 145 A. 437 (1929), and then only if they tend to blacken the character of the patient. *Soltaniuk v. Metropolitan Life Ins. Co.*, 133 Pa.Super. 139, 143–144, 2 A.2d 501 (1938). With the exception of the name, address, and so forth, and a few items concerning the patient's health history entered in his records, Dr. Greenlee's testimony did not and would not have revealed any information obtained by communications from the patient. The revealing of a name, address and other identifying data given by a patient is not a communication which tends to blacken the character of the patient. *Sweeney v. Green*, 116 Pa.Super. 190, 176 A. 849 (1935)."

The Supreme Court of Pennsylvania held also in *In re B*, 482 Pa. 471, 394 A.2d 419 (1978) that the privilege protects only "communications", disclosure of which would "tend to blacken the patient's [reputation]".

**5.** 28 P.S. § 328 provides: "No person authorized to practice physics or surgery shall be allowed, in any civil case, to disclose any information which he acquired in attending the patient in a professional capacity, and which was necessary to enable him to act in that capacity, which shall tend to blacken the character of the patient, without consent of said patient, except in civil cases, brought by such patient, for damages on account of personal injuries."

In *In re B*, the subject matter was completely different from that of the present case of employer and employee potential privileges, because in *In re B* the doctor-patient privilege related to a relationship of a psychotherapeutic process where the patient's most intimate emotions, fears and fantasies were required to be disclosed to the therapist, and so the court held that such a relationship has deeper roots than does the Pennsylvania doctrine of the patient privilege statute and as such was constitutionally protected.

The respondent in the instant case has no similar claim to resist the subpoena duces tecum by the government. Its argument is that personally identifiable information need not be disclosed by the employer, unless the employee consents, and unless the government gives written assurance of non-disclosure. This argument by the respondent is based upon *General Motors v. Director of NIOSH*, 459 F.Supp. 235, 239 (S.D. Ohio, 1978), which held that NIOSH has the power to demand that an employer provide it with medical records of the company's employees, but need not provide the names and addresses of those employees. This reliance by the respondent, however, on the *General Motors* case is misplaced. The decision of Judge Rubin of the Southern District of Ohio was based upon Ohio's physician-patient privilege law and not upon general principles protecting the right of privacy itself.

The respondent nowhere in its briefs has asserted a similar claim to a Pennsylvania physician patient privilege on which to base its refusal to provide the desired information. But even if it had, the existence of such a privilege would be irrelevant on the authority of *Kerr v. United States, District Court for Northern District of California*, 511 F.2d 192, 197, C.A. 9, 1975, and *Heathman v. United States District Court for the Central District of California*, 503 F.2d 1032, C.A. 9, 1974, which stated,

" '[I]n federal question cases the clear weight of authority and logic supports reference to federal law on the issue of the existence and scope of an asserted privilege. 2B Barron & Holtzoff, Federal Practice and Procedure (Wright Ed.1961), § 967 at 243; 4 Moore's Federal Practice, § 26.60(7) at 26–255; 8 Wright & Miller, Federal Practice & Procedure, Civil § 2016 at 123; Proposed Federal Rules of Evidence, Rules 501–02.' "

Accord, *Osterneck v. E. R. Barwick Industries, Inc.*, 82 F.R.D. 81, 87 (N.D.Ga., 1979); *Lewis v. United States*, 517 F.2d 236, 237, C.A. 9, 1975. No physician-patient privilege exists as a matter of federal common law. *Robinson v. Magovern et al.*, 83 F.R.D. 79, 90 (W.D.Pa., 1979).

In opposition to the respondent's position, the petitioner cites *E. I. DuPont de Nemours & Co. v. Finklea*, 442 F.Supp. 821 (S.C.W.Va.1977). There Judge Knapp held valid a subpoena duces tecum served on DuPont by NIOSH. NIOSH's demand for employee medical records was based upon an employee's request that NIOSH investigate a possible high cancer rate among employees at a particular DuPont plant. The *DuPont* case upheld the authority of NIOSH to obtain the records, including the names and addresses of the employees. The court's decision was based on *Whalen v. Roe*, 429 U.S. 589, 601, 97 S.Ct. 869, 872, 51 L.Ed.2d 64 (1977) decision that where there is no evidence that a governmental agency would improperly administer this power, the authority of the agency to subpoena private medical records, including the names and addresses of the persons involved, will be upheld.

Thus, regarding the evidence presented in the matter before me, there has been no demonstration by the respondent that individually identifiable medical records would be improperly disclosed. On the contrary, the evidence indicates that NIOSH's procedures of safekeeping the records and of removing the names and addresses of the individuals in its compilation of published data represents sufficiently adequate assurance of non-disclosure by the petitioner (even without a written assurance), such assurance being comparable to the assurance given by NIOSH in *DuPont, supra*, at page 825 and commensurate with the result in that case.

The respondent further argues that NIOSH's petition for enforcement of the subpoena duces tecum fails to meet all three of the requirements of *United States v. Morton Salt Co.*, 338 U.S. 632, 70 S.Ct. 357, 94 L.Ed. 401 (1940),

(1) the inquiry must be within the scope of the authority of the agency;

(2) the demand must not be too indefinite; and

(3) the information sought must be reasonably relevant to the authorized inquiry.

■ As to the first of these requirements, the petitioner's inquiry is undoubtedly within the scope of NIOSH's authority. The petitioner's inquiry was made pursuant to 29 U.S.C. § 669(a)(6) authorizing such an investigation following a request by an employee's authorized representative of the respondent's Trafford plant, who was concerned with the possibility of certain toxic substances having a harmful effect on the health of the employees of that plant. *Du-Pont, supra*, at page 824, similarly upheld NIOSH's subpoena pursuant to 29 U.S.C. § 669. *General Motors, supra*, cited by the respondent, at page 238, took this position even more strongly holding that a subpoena duces tecum may be used to provide statistical data needed for government reports, rule-making and legislating, and is not intended solely for enforcement purposes. Thus, the petitioner's inquiry here is well within the scope of its authority.

As to requirements (2) and (3) of *Morton Salt, supra*, Judge Knapp in *DuPont, supra*, at page 824, summarily dismissed such as these as "a fortiori" not too indefinite a request for information and not irrelevant, since the information sought was within the authority of the agency.

■ The petitioner's request for information is definite. The request is for specific records, namely the medical records, and only the medical records of certain, specific employees. The request is sufficiently "definite" for obtaining the information required. *Morton Salt, supra.*

The respondent cites *General Motors, supra*, for some of its reliance but the facts of that case are not pertinent to this case. *General Motors* relates to the privilege existing between a physician and patient. The respondent relies upon the federal law set forth in *Singleton v. Wulff*, 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976), where a third party physician attempted to protect women patients who might have been both physically and financially in aid of procuring abortions, to establish its standing. There the Supreme Court made an exception because of the circumstances and said a third party ordinarily is not a proper party to claim a privilege. But in *Singleton, supra*, the women were in need of someone to help them and the doctors in that case were the appropriate persons to look to for the needs of the women. However, the Supreme Court did not rule that third parties may generally, and as a class, claim such privileges. It is only where the third party is so related as to be a necessary protector or defender of the one whose privilege may be violated.

In our case, Westinghouse is the employer of a number of persons, and it seeks, as it asserts, to protect the privilege of its employees and prevent the divulging of medical information taken by its doctors as of the time when they were employed. It is not for me to determine what the respondent's interest is here. What matters is that the United States, through Congress has expressed a serious concern for these same employees who might have been patients of the respondent's doctors. As such, it accordingly assumes a superior position and responsibility for protecting these same employees than does the employer. This is a constitutional right in the Congress to do so for the purpose of preserving the health and welfare of the public, wherever such circumstances may exist.

In Senate Report No. 91–1282, U.S.Code Cong. & Admin.News 1970, at page 5177, it said,

"The purpose of S. 2193 is to reduce the number and severity of work-related injuries and illnesses which, despite current

efforts of employers and government, are resulting in ever-increasing human misery and economic loss."

It thereafter stated by what means it intended to do so and resulted in the enactment of the statute under which the petitioner in this case is proceeding.

The Constitution of the United States provides that "[t]he Congress shall have Power to . . . provide for the . . general welfare of the United States . . .", Article I, Section 8, Clause [1]. Through this clause and the commerce clause primarily, Congress enacts legislation to promote the general health, safety and welfare of the people of the United States.

"Congressional power to regulate commerce is not confined exclusively to promotion of trade among states, but may be used to promote public welfare in every particular, including health, morals, public safety, peace and good order . . ." *Kentucky Whip & Collar Co. v. Illinois Cent. R. C.*, 12 F.Supp. 37 (D.D.Ky., 1935), aff'd. 84 F.2d 168, aff'd. 299 U.S. 334, 57 S.Ct. 277, 81 L.Ed. 270.

■ The promotion and improvement of health is a fundamental obligation of national, local and state governments. *Ellis v. City of Grand Rapids*, 257 F.Supp. 564 (W.D.Mich.1966), and the constitutional provisions relating thereto for the security of persons and property should be liberally construed. *United States v. Smith*, 23 F.Supp. 528 (D.C.Mo., 1938).

The sovereign in this case is the United States of America through its legally delegated agency and representative and must be accorded every support by the judiciary which the Constitution and Acts of Congress infer. It stands thus as the chief guardian for the protection and promotion of health which is includable in the public welfare of its citizens and is one that must not be denied, particularly after it is brought to the attention of the sovereign or its delegated agents.

A complaint or complaints had been made by an employee or employees or their union representative. This in turn properly triggered the protective activities of the government agency for the welfare, benefit and health of employees for whom the respondent now raises its defenses.

The information request by the petitioner is also relevant to the agency's needs. NIOSH must have the entire medical records in personally identifiable form of the employees under study in order to properly conduct its Health Hazard Evaluation, to facilitate adequate record-keeping of the information and to prepare an accurate study of the matter. The function which the petitioner is exercising here is not only appropriate but is legally and authoritatively mandated. It is not within the power of the courts to thwart such statutory and constitutional functions, but to the contrary, the courts must lend their judicial authority to aid the petitioner to so function.

Accordingly, for the reasons herein set forth, compliance with the statute will be granted in the form issued by the Director for the National Institute for Occupational Safety and Welfare.

The Findings of Fact and Conclusions of Law are incorporated in this Opinion in accordance with Federal Rule of Civil Procedure No. 52.[6]

---

**6.** Rule 52. Findings By The Court.

(a) Effect. In all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its conclusions of law thereon, . . . If an opinion or memorandum of decision is filed, it will be sufficient if the findings of fact and conclusions of law appear therein.