### UNITED STATES v. SPOKANE FUEL DEALERS CREDIT ASS'N, Inc., et al.

No. C–7641.

District Court, E. D. Washington, N. D.

April 17, 1944.

Edward M. Connelly, U. S. Atty., of Spokane, Wash., and Charles S. Burdell and Robert McFadden, Sp. Assts. to Atty. Gen., for plaintiff.

Randall & Danskin, Thos. A. Scott, Chas. P. Lund, James A. Brown, Graves, Kizer & Graves, Norman F. Trezona, Irving Davis, Paine, Lowe, Davis & Russell, and Richard S. Munter, all of Spokane, Wash., for defendants.

SCHWELLENBACH, District Judge.

The defendants, Spokane Fuel Dealers Credit Association, Inc., and a large number of firms, corporations and individuals engaged in the fuel business in the Spokane area are charged by indictment with conspiracy in restraint of trade in violation of Section 1 of the Sherman Act, 26 Stat. 209, 15 U.S.C.A. § 1. The defendants' demurrers to the indictment were overruled after extensive argument. During the course of this argument, considerable discussion ensued as to the effect upon this prosecution of the passage by Congress of the Bituminous Coal Act of 1937, 15 U.S.C.A. § 828 et seq. That discussion occasioned the filing by plaintiff of a motion that the Court consider, preliminary to the trial, the question thus raised. Counsel for defendants assented. As a consequence, extensive briefs have been filed and oral arguments were presented. While these briefs and arguments covered a wide field, they may be narrowed down to three questions which, for the guidance of counsel at the time of trial, I will now discuss.

### I.

Defendants' Counsel contend that with the passage of the Guffey Coal Act Congress lifted the restrictions of the Sherman Act from all those engaged in any branch of the bituminous coal industry. To evaluate this contention, we must look to the Act itself and to the legislative record. The Act provides, 15 U.S.C.A. § 832(d): "No action complying with the provisions of this section and section 833 taken while this subchapter is in effect, or within sixty days thereafter, by any code member or by any district board, or officer thereof, shall be construed to be within the prohibitions of the antitrust laws of the United States."

This precise question was thoroughly threshed out during Congressional debates. Senator Borah contended, as do counsel for the defendants, that the passage of the Act with this provision amounted to a complete surrender of federal control under the Sherman Act insofar as bituminous coal was concerned. Congressional Record, Vol. 81, Pt. 3, pp. 2995–3003. He read the foregoing provision in connection with Section 12 of the Act, 15 U.S.C.A. § 842, which reads: "Any combination between producers creating a marketing agency for the disposal of competitive coals in interstate commerce or in intrastate commerce directly affecting interstate commerce in coal at prices to be determined by such agency, or by the agreement of the producers operating through such agency, shall, after promulgation of the code provided for in sections 831, 832 and 833, be unlawful as a restraint of interstate trade and commerce within the provisions of sections 1 to 27 of this title, unless such producers have accepted

the code provided for in sections 831, 832 and 833 and shall comply with its provisions." He offered an amendment to that section in which he inserted the words "authorized by this section" after the word "combination" in the first line and the word "not" after the word "shall" in the fifth line. This amendment had been suggested by Senator Schwartz and was lying on the table at the time. Senator Neely, who was in charge of the bill, declined to accept the amendment and made the following statement: "Mr. President, the sponsors of this bill painstakingly endeavored to bring the provision which is now under attack by the able Senator from Idaho within the purview of the language of the Supreme Court of the United States in the Appalachian case, which was read just a moment ago by the able Senator from Kentucky (Mr. Barkley). Those who are urging the passage of this bill believe that the amendment that has been offered would probably subject the bill, if it should become a law, to an attack that could not be justified by the language which the Supreme Court used in the Appalachian case. For that reason, we object to the amendment." Mr. Schwartz declined to offer the amendment himself stating: "I realize, of course, that the suggested amendment will change the purpose of the section. I therefore do not care to offer the amendment." Mr. Borah then moved its adoption and it was rejected by the Senate. Thereupon, Mr. Borah moved to strike out section 12. That amendment was also rejected.

No one can read the debates of the Senate of March 31 and April 1, 1937, and avoid the conclusion that it was the opinion of the Senate that the Guffey Act in no sense repealed the Sherman Act. Senator Minton succinctly stated the Senate opinion in the following language: "I desire to point out to the Senator that this bill does not repeal the Sherman antitrust law, but rather broadens the scope of its operation, in that it takes away the exemption accorded to those who operate as they did operate in the case which reached the Supreme Court, known as the Appalachian Coal case. In other words, if this bill should go into effect, such a combination as that would be condemned and would be within the purview of the Antitrust Act. Therefore, instead of repealing the Antitrust Act, the scope of the Antitrust Act would be enlarged." Legislative discussion of this feature of the bill was limited exclusively to the Senate.

That Senator Borah's fears were unfounded is no longer open to doubt since the decision in the case of United States v. Borden Co., 308 U.S. 188, 197–200, 60 S.Ct. 182, 188, 84 L.Ed. 181. That case was a Sherman Act prosecution against milk distributors, a cooperative association of milk producers, the Milk Wagon Drivers Union and others. One of the questions involved was the effect upon the Sherman Act of the Agricultural Marketing Agreement Act, 50 Stat. 246, 7 U.S.C.A. § 671 et seq., which gave to the Secretary of Agriculture the power of regulation, supervision and control of the milk industry in any given milk shed. The district court held that the existence of the authority vested in the Secretary of Agriculture, although unexercised, wholly destroyed the operation of Section 1 of the Sherman Act with respect to the marketing of agricultural commodities. In the Agricultural Act, as in the Guffey Act, the Congress defined the extent to which its provisions made the antitrust laws inoperable. 7 U.S.C.A. § 608b. On this question Chief Justice Hughes, speaking for the Court, said: "It is a cardinal principle of construction that repeals by implication are not favored. When there are two acts upon the same subject, the rule is to give effect to both if possible. * * * It is not sufficient as was said by Mr. Justice Story in Wood v. United States, 16 Pet. 342, 362, 363, 10 L.Ed. 987, 'to establish that subsequent laws cover some or even all of the cases provided for by (the prior act); for they may be merely affirmative, or cumulative, or auxiliary'. * * * The Sherman Act is a broad enactment prohibiting unreasonable restraints upon interstate commerce, and monopolization or attempts to monopolize, with penal sanctions. The Agricultural Act is a limited statute with specific reference to particular transactions which may be regulated by official action in a prescribed manner. The Agricultural Act declared it to be the policy of Congress 'through the exercise of the powers conferred upon the Secretary of Agriculture under this chapter, to establish and maintain such orderly marketing conditions for agricultural commodities in interstate commerce as will establish prices to farmers at a level that will give agricultural commodities a purchasing power with respect to articles that farmers buy, equivalent to the purchasing power of agricultural commodities in the base period' described. To carry out that policy a particular plan is

set forth. Farmers and others are not permitted to resort to their own devices and to make any agreements or arrangements they desire, regardless of the restraints which may be inflicted upon commerce. The statutory program to be followed under the Agricultural Act requires the participation of the Secretary of Agriculture who is to hold hearings and make findings. The obvious intention is to provide for what may be found to be reasonable arrangements in particular instances and in the light of the circumstances disclosed. The methods which the Agricultural Act permits to attain that result are twofold, marketing agreements and orders. To give validity to marketing agreements the Secretary must be an actual party to the agreements. Section 8b. The orders are also to be made by the Secretary for the purpose of regulating the handling of the agricultural commodity to which the particular order relates. Sec. 8c (3) (4). That the field covered by the Agricultural Act is not coterminous with that covered by the Sherman Act is manifest from the fact that the former is thus delimited by the prescribed action participated in and directed by an officer of government proceeding under the authority specifically conferred by Congress. As to agreements and arrangements not thus agreed upon or directed by the Secretary, the Agricultural Act in no way impinges upon the prohibitions and penalties of the Sherman Act, and its condemnation of private action in entering into combinations and conspiracies which impose the prohibited restraint upon interstate commerce remains untouched. * * * "

Chief Justice Hughes then pointed out the provisions in section 3(d) of the Agricultural Marketing Agreement Act which concluded "No meeting so held and no award or agreement so approved shall be deemed to be in violation of any of the antitrust laws of the United States." After pointing this out, the United States." After pointing this out, Mr. Chief Justice Hughes concluded: "These explicit provisions requiring official participation and authorizations show beyond question how far Congress intended that the Agricultural Act should operate to render the Sherman Act inapplicable. If Congress had desired to grant any further immunity, Congress doubtless would have said so." What was there said by the Supreme Court concerning the Agricultural Marketing Act is fully applicable here concerning the Guffey Coal Act.

## II.

Defendants contend that the failure of Congress to legislate concerning the sales of coal by dealers proves that Congress recognized its lack of power so to regulate or recognized that the activities of such dealers did not affect interstate commerce. This contention is answered by the Act itself and the legislative record. Sec. 4-A of the Act, 15 U.S.C.A. § 834, provided: "Whenever the Commission upon investigation instituted upon its own motion or upon petition of any code member, district board, State or political subdivision thereof, or the consumers' counsel, after hearing finds that transactions in coal in intrastate commerce by any person or in any locality cause any undue or unreasonable advantage, preference, or prejudice as between persons and localities in such commerce on the one hand and interstate commerce in coal on the other hand, or any undue, unreasonable, or unjust discrimination against interstate commerce in coal, or in any manner directly affect interstate commerce in coal, the Commission shall by order so declare and thereafter coal sold, delivered or offered for sale in such intrastate commerce shall be subject to the provisions of sections 831, 832 and 833."

As the bill was introduced and as it passed the House of Representatives, it read: "Whenever the Commission * * * finds that *the prices of coal sold by producers in* transactions in intrastate commerce cause any undue or unreasonable advantage, preference, or prejudice as between persons and localities in such commerce on the one hand and interstate commerce on the other hand, or any undue, unreasonable, or unjust discrimination against interstate commerce, the commission shall by order so declare and thereafter coal sold in such intrastate commerce shall be subject to the provisions of section 4 relating to prices."

As the bill was reported out by the Senate committee, the words "the prices of coal sold by producers in" were stricken. Senator Tydings raised a question as to the effect of this amendment. Congressional Record, Vol. 81, Pt. 3, p. 2959. Senator Barkley stated: "That is practically writing into the law the principle laid down in the Shreveport case" (Houston, E. & W. T. R. Co. v. United States, 234 U.S. 342, 34 S.Ct. 833, 58 L.Ed. 1341), and Senator Tydings responded that, in view of the Schechter decision in which the doctrine

of the difference between the direct and indirect effect upon interstate commerce was enunciated, he had doubts of the power of Congress to extend the Shreveport doctrine beyond the domain of railroad rate cases. Senator Neely answered this observation with the following statement: "I believe that the following paragraph from the opinion of the Supreme Court in the Carter case will allay the fears of the Senator from Maryland upon this point. What I am about to read is from the findings of the lower court, but it was quoted with approval by the Supreme Court: 'Other findings are to the effect that such coal is generally sold f.o.b. mine, and the predominant portion of it shipped outside the State in which it is produced; that the distribution and marketing is predominantly interstate in character, and that the intrastate distribution and sale are so connected that interstate regulation cannot be accomplished effectively unless transactions of intrastate distribution and sale be regulated. The court further found the existence of a condition of unrestrained and destructive competition in the system of distribution and marketing such coal, and of destructive price-cutting, burdening and restraining interstate commerce and dislocating and diverting its normal flow.'" Thereafter Senator Wheeler made the following statement: "With reference to section 4-A, I desire to say that in my judgment it does go further than anything that has been decided by the Supreme Court up to the present time. However, if the philosophy of the bill is correct, and we are going to seek to do the things that it is desired to do with reference to interstate shipments of coal, and coal in general, then, in my judgment, unless the commission should be given the power to do the things described in section 4-A, the whole bill would completely break down."

The next day Senator Austin attempted to amend the bill by inserting in lieu of paragraph 4-A the following: "Intrastate commerce in coal which proximately affects the price of coal in the flow of interstate commerce is subject to regulation under this Act." That amendment was rejected. Congressional Record, Vol. 81, pt. 3, p. 3010, 3013. Thereupon, Mr. Austin proposed the following amendment: "Intrastate transactions in distribution and sale of coal which are so intimately and inextricably connected with interstate transactions in distribution and sale of coal that the regulation of such interstate transactions cannot be accomplished effectively without discrimination against interstate commerce, shall be construed as directly affecting interstate commerce." That amendment was also rejected. Congressional Record, Vol. 81, pt. 3, p. 3014. This legislative record clearly demonstrates the recognition by Congress of the relationship between intrastate transactions in coal and interstate transactions. The Congress was unwilling to agree to any amendments which might be construed as a recognition of any limitation on its power under the commerce clause of the Constitution, Article 1, § 8, cl. 3.

### III.

The most vexing question posed by the defendants involves the status of the charge that one of the devices used by them was a price-fixing agreement. They do not deny that any price-fixing agreement is per se an unreasonable restraint of trade. They assert, however, that the basis of the per se rule is, as was outlined in United States v. Socony-Vacuum Oil Co., Inc., 310 U.S. 150, 218, 60 S.Ct. 811, 842, 84 L.Ed. 1129: "Agreements for price maintenance of articles moving in interstate commerce are, without more, unreasonable restraints within the meaning of the Sherman Act because they eliminate competition, United States v. Trenton Potteries Co., 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700, 50 A.L.R. 989. * * *" Defendants assert that since the Congress by the Guffey Act removed the controls of the Sherman Act from all coal entering interstate commerce, any agreement for price maintenance between dealers distributing coal locally cannot be said to eliminate competition and therefore cannot be declared to be per se an unreasonable restraint within the meaning of the Sherman Act. They contend that by authorizing price fixing among coal producers, the Congress so suppressed competition in interstate commerce as to make inapplicable the per se unreasonable restraint rule concerning their own price fixing activities. With all due respect to the exhaustive brief submitted by plaintiff, I am convinced that to find a correct answer to this question, we must come to much closer grips with the problem than have plaintiff's counsel. I have studied all of the cases upon which plaintiff relies and a host of others. I do not think they supply an adequate answer to the defendants' contention.

First, we must understand the nature of the per se rule. It is a rule of substantive law and not one of evidence. It has been inaccurately characterised as a conclusive presumption. Mr. Wigmore pointed out the error in this characterization (Wigmore on Evidence, 3d ed. sec. 2492) with the following language: "In strictness, there cannot be such a thing as a conclusive presumption. Wherever from one fact another is said to be conclusively presumed, in the sense that the opponent is absolutely precluded from showing by any evidence that the second fact does not exist, the rule is really providing that, where the first fact is shown to exist, the second fact's existence is wholly immaterial for the purpose of a proponent's case; and to provide this is to make a rule of substantive law, and not a rule apportioning the burden of persuading as to certain propositions or varying the duty of coming forward with the evidence." For example, in an action against a man for striking another with his automobile while operating it at a rate of speed in excess of the statutory limit, the plaintiff need not prove that the defendant was driving negligently. The Court will instruct the jury that he was driving negligently because he was driving in excess of the speed limit. Since the plaintiff need not prove the negligent character of his driving, the defendant is not permitted to prove the careful character of his driving. To permit him so to do would be to permit him to create a fictitious issue. That the law does not allow. This is true even though, under the circumstances, driving at a rate of speed in excess of the legal limit might not be considered negligent. That is precisely the sort of a rule with which we are concerned here. The courts have said that where price fixing occurs, competition is destroyed or diminished. Therefore, price fixing, in itself, is an unreasonable restraint of trade. That was so under the common law. United States v. Addyston Pipe & Steel Co., 6 Cir., 85 F. 271, 291, 46 L.R.A. 122; Addyston Pipe & Steel Co. v. United States, 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136. In that case, the Supreme Court adopted the following statement of Judge Taft in the court below: "Upon this review of the law and the authorities, we can have no doubt that the association of the defendants, however reasonable the prices they fixed, however great the competition they had to encounter, and however great the necessity for curbing themselves by joint agreement from committing financial suicide by ill-advised competition, was void at common law, because in restraint of trade, and tending to a monopoly."

Further, we must have in mind the extent of congressional control over interstate commerce and the measures which it may apply in exercising that control. The power of Congress over interstate commerce is plenary and complete in itself, it may be exercised to its utmost extent and acknowledges no limitations other than are prescribed in the Constitution. Gibbons v. Ogden, 9 Wheat. 1, 196, 6 L.Ed. 23. The reach of that power extends to those intrastate activities which in a substantial way interfere with or obstruct the exercise of the granted power. United States v. Wrightwood Dairy Co., 315 U.S. 110, 119, 62 S.Ct. 523, 86 L.Ed. 726. The Congress has exercised that power in a variety of ways. It has used it to prevent the pollution of the stream of interstate commerce itself; for example, by regulating safety appliances on railroad cars. Southern R. Co. v. United States, 222 U.S. 20, 32 S.Ct. 2, 56 L.Ed. 72. It has excluded from interstate commerce those articles which it considered noxious. See Lottery Cases, (Champion v. Ames) 188 U.S. 321, 23 S.Ct. 321, 47 L.Ed. 492; Brooks v. United States, 267 U.S. 432, 45 S.Ct. 345, 69 L.Ed. 699, 37 A.L.R. 1407; Kentucky Whip & Collar Co. v. Illinois Cent. R. Co., 299 U.S. 334, 57 S.Ct. 277, 81 L.Ed. 270; Hipolite Egg Co. v. United States, 220 U.S. 45, 31 S.Ct. 364, 55 L.Ed. 364. It has also exercised its control in order to maintain the constancy of the flow in the stream of interstate commerce. It was in part to achieve this end that the Sherman Act was passed.

The Supreme Court has approved the use of the Act to prevent obstructions placed directly in the bed of the stream. Thus, when railroad companies attempted to restrict the facilities of distribution in interstate commerce, the Supreme Court struck down such efforts. Northern Securities Co. v. United States, 193 U.S. 197, 24 S.Ct. 436, 48 L.Ed. 679; United States v. Union Pac. R. Co., 226 U.S. 61, 33 S.Ct. 53, 57 L.Ed. 124. It has held that it would not permit obstructions at the head of the stream by restrictive agreements which would prevent or impede the flow of commodities into the stream. Fashion Orig-

inators' Guild v. Federal Trade Commission, 312 U.S. 457, 668, 61 S.Ct. 703, 85 L. Ed. 949; Addyston Pipe & Steel Co. v. United States, supra. It has held that even those who operate under the protection of the patent, trade mark and copyright laws have no right to extend the benefits of their monopoly beyond the point of sale by the patentee. Dr. Miles Medical Co. v. John D. Park & Sons Co., 220 U.S. 373, 31 S. Ct. 376, 55 L.Ed. 502; Interstate Circuit, Inc., v. United States, 306 U.S. 208, 59 S. Ct. 467, 83 L.Ed. 610; United States v. Masonite Corp., 316 U.S. 265, 62 S.Ct. 1070, 86 L.Ed. 1461; United States v. Bausch & Lomb Optical Co., 64 S.Ct. 805.

In the argument upon the demurrers, defendants contended that the doctrine has never been extended to the point of prohibiting restrictive agreements between dealers beyond the mouth of the stream operating within a state in the sale and distribution of articles which had come to rest within the state. That is a question which I cannot decide until the Government has submitted its evidence. I am not passing on it now. We are interested now only in determining the effect of the Guffey Act upon this prosecution. There is one thing, however, we do know—that an obstruction at the mouth of a stream may just as effectively impede the flow within the stream as an obstruction at its head. For example, the construction of Grand Coulee Dam in the Columbia River not only impeded the flow of water in that river but it backed up and impeded the flow of the Spokane River which runs into the Columbia. There were many dams in the upper Spokane River. That fact did not prevent the obstruction which was placed in the Columbia from interfering with the flow of water in the Spokane River. What is true of a natural stream is true of the artificially created stream of interstate commerce. Even if the Guffey Act did restrict the flow of coal into the stream of interstate commerce, it did not, as a factual matter, prevent these defendants and others like them from restricting the flow in interstate commerce by erecting barriers at the mouth of the stream. They would be bound to affect the constancy of the flow in the stream. It may be, as counsel contends, that the Sherman Act does not reach this sort of an activity. If it does, then the price-fixing feature of defendants' activities comes within the rule of being per se unreasonable and the Guffey Act has done nothing to change this result.