191 P.2d 996

**BLACK HAWK CONSOL. MINES CO. v. GALLEGOS, Commissioner of Revenue.**

No. 5044.

Supreme Court of New Mexico.

March 5, 1948.

Rehearing Denied April 23, 1948.

J. F. Woodbury and Ben Shantz, both of Silver City, for appellant.

C. C. McCulloh, Atty. Gen., William R. Federici, Asst. Atty. Gen., and Louis C. Lujan, of Albuquerque, for appellee.

LUJAN, Justice.

The appellant, as plaintiff, brought this action against appellee (Commissioner of Revenue), as defendant, under Chapter 94, Section 5, of the New Mexico Session Laws of 1939, 1941 Comp. Section 76-1428, to recover $704.05, money paid under protest, as a tax for the privilege of doing

a mining business within the State, as imposed by the provisions of 1941 Comp. Section 76-1404, subd. A.

Upon appellant's refusal to further plead within the time allowed it after sustaining a demurrer to its complaint, appellee moved the court for dismissal of the complaint. The motion was granted and final judgment entered accordingly. This is a direct appeal from the decree of dismissal.

The facts, which are admitted, necessary to be stated to understand the questions raised by appellant, by his assignments of error, may be briefly stated as follows: That the appellant is a foreign corporation, duly authorized to do business in the state; that it is and has been engaged in the business of operating a gold and silver mine in New Mexico; that prior to the month of July 1941, appellant did not report sales tax upon its mining operations as measured by its gross receipts, but following the effective date of the 1941 amendments to the Emergency School Tax Act, appellant paid its tax under protest for the months of July, August, September and October 1941; that all of the gold and silver produced by appellant during the period in question was sold to the United States mint at Denver, Colorado, in accordance with the provisions of the Gold Reserve Act of 1934, 48 Stat. 337, and the Emergency Farm Mortgage Act of 1933, 48 Stat. 41, and all amendments thereto and regulations issued under the provisions thereof; that the acts, which antedated the Emergency School Tax Act, provided that all gold produced should become on production subject to requisition by the United States, and the Executive was given power by Executive order to provide rules and regulations by which producers should sell their gold to the United States mint, under which power the Executive provided for the enforced sale of all newly mined gold to the United States mint.

The first point relied upon for reversal is that the lower court erred in granting appellee's motion to dismiss appellant's complaint for the reason that it is exempt from paying the tax in question by the express provisions of Section 76-1405 of 1941 Comp. which reads as follows:

"Exemption of governmental transactions—Constitutional exemptions.—None of the taxes levied by this act shall be construed to apply to sales made to the government of the United States or any agency or instrumentality thereof, except a corporate agency or corporate instrumentality, nor to sales to the state of New Mexico or any of its political subdivisions; provided that deposits of gold and silver with the United States' mint shall not be considered as sales to the government of the United States and shall not be exempt thereunder; nor shall such taxes apply to any businesses or transactions exempted.

from taxation under the Constitution of the United States or the state of New Mexico."

The contention is obviously wrong. At the time of the enactment of this law the question of whether deposits, or transfers, of gold and silver with the United States Mint were sales, was questioned. The early decisions of the Federal District Courts were to the effect that they were not sales, but administrative acts of the Government. Holland, Admr, Etc., v. Haile Gold Mines, 1942, 44 F.Supp. 641; Fox v. Summit King Mines, 1943, 48 F. Supp. 952. The legislature might well have been in doubt as to whether such a transaction constituted a sale and this doubt resolved into a legislative determination that such deposits "shall not be considered as sales to the government of the United States." Whether it is in fact a sale is beside the question. It is clear that the legislature intended to exclude transfers of gold and silver to the United States Mint, whether or not such transactions are sales, from the operation of the specific exemption otherwise provided in that section of the statute.

■ Notwithstanding such deposit results in a transfer of title, and is in effect a sale, Walling v. Haile Gold Mines, 4 Cir., 136 F.2d 102; Luke v. East Vulture Min. Co., 47 Ariz. 220, 54 P.2d 1002, the legislature intended to, and did, exclude it from the *statutory exemptions* of sales to the United States, even though the tax may be void for constitutional reasons, a question yet to be considered. The Arizona statute construed in the Luke case levied a privilege tax "upon the *gross proceeds of sales or gross income* from the business of 'mining * * * or producing * * * gold * * * .'" Laws Ariz.1935, c. 77, art. 2, § 2(c), par. 1. It exempted *all sales* to the United States, without exception, from the operation of the tax. As the tax was levied upon "sales," and the transfer to the United States was a sale, it logically followed that the gold in question was exempted by the statute from the tax, and the Arizona court so held.

The second assignment of error is as follows:

"The trial court erred in sustaining defendant's demurrer to plaintiff's complaint for the reason that sales by appellant to the United States Mint constitute transactions in interstate commerce which are exempt from taxation by the state under the Constitution of the United States and the express provisions of Section 76-1405 of the New Mexico Statutes, 1941, Annotated."

That the shipment of gold and silver to the United States Mint, across state lines to Denver, is interstate commerce, has been determined by a number of decisions of the Circuit Courts of Appeal of the United States in construing the Fair Labor

Standards Act, 29 U.S.C.A. § 201 et seq. (Canyon Corp. v. National Labor Relations Board, 8 Cir., 128 F.2d 953; Walling v. Haile Gold Mines, 4 Cir., 136 F.2d 102; Fox v. Summit King Mines, 9 Cir., 143 F.2d 926; and by one Federal District Court in Robertson v. Alaska Juneau Min. Co., D.C., 61 F.Supp. 265), but the early Federal District Court decisions were not in accord. Holland, Adm'r, v. Haile Gold Mines, supra; Fox v. Summit King Mines, supra.

Our research satisfies us that the question has not been decided by the Supreme Court of the United States, but we should, and will, accept as correct the Federal decisions here cited, to the effect that shipment of gold across state lines to a United States Mint is interstate commerce, under the Fair Labor Standards Act; and we believe it has application here. It does not follow, however, that the appellant is not liable to this tax.

It is provided by the Emergency School Tax statute:

"There is hereby levied, and shall be collected by the bureau of revenue, privilege taxes, measured by the amount or volume of business done, against the persons, on account of their business activities, engaging or continuing, within the state of New.Mexico in any business as herein defined, and in the amounts determined by the application of rates against gross receipts, as follows:

"A. At the amount equal to the percentages hereinafter in this paragraph specified, of the gross receipts of the business of every person engaging or continuing in the business of mining, quarrying or extracting from the natural resources of this state, for sale, profit or commercial use, any oil, natural gas, carbon dioxide gas, potash, copper, gold, silver, limestone, sand, gravel, or other metalliferous or non-metalliferous mineral products or combination, or compound of mineral products, or felling or producing timber for sale, profit or commercial use; providing that coal shall not be subject to the provisions of this paragraph (A).

"Upon oil, natural gas, carbon dioxide gas and potash, at the rate of two (2) per cent of the gross receipts, and upon all other businesses specified in this paragraph, at the rate of one-half of one per cent of the gross receipts.

"The measure of the tax imposed by this paragraph is the value of the entire production *in this state, regardless of the place of sale or the fact that delivery may be made to points outside of the state.*" (Our Emphasis.)    Sec. 76-1404 N.M.Sts. 1941.

The following statutory definitions are explanatory of.the nature of the tax:
"*    *    *

"(d) The term 'gross receipts' means the total receipts of a taxpayer received as compensation for personal or professional services for the exercise of which a privilege tax is imposed by this act, the total receipts of a taxpayer derived from trades, business, commerce, and the gross proceeds of sales as hereinafter defined, and without any deduction on account of losses or expenses of any kind.

    \*    \*    \*    \*    \*    \*

"(f) The term 'business' when used in this act shall include all activities or acts engaged in (personal, professional, and corporate) or caused to be engaged in with the object of gain, benefit or advantage either direct or indirect. \* \* \*" Sec. 76-1402 N.M.Sts.1941.

The New Mexico Emergency School Tax is a tax upon the privilege of engaging or continuing in business in New Mexico. It is not limited to taxing those whose gross receipts are derived from sales of property; but it covers the entire range of business activities, with a few specific exceptions. It is sometimes measured by gross sales, but often by gross receipts for professional services, and from other businesses or occupations which are in no sense "sales" as that word is ordinarily used. It has been erroneously denominated a "sales tax" by this Court, more than once (Albuquerque Broadcasting Co. v. Bureau of Revenue, 51 N.M. 332, 184 P.2d 416; Iden v. Bureau of Revenue, 43 N.M. 205, 89 P.2d 519), but as the Act provides, it is a privilege or excise tax; a tax upon the privilege of engaging in or continuing in business in this state.

In support of its contention that the tax in question is a "sales tax" the appellant cites Gallup American Coal Co. v. Beall, 39 N.M. 188, 43 P.2d 927, 928. The statute in question was amended materially by Sec. 1, Ch. 133 N.M.L.1941, since the decision in the Beall case. The present statute has not been before this court for construction. The amendment took from and added to the statute. Its substance was incorporated in the original statute, except the proviso with reference to the deposits of gold and silver with the United States Mint, which was added. A part of the original statute read, "\* \* \* Nor shall such taxes apply to sales made to the Government of the United States or any of its departments or agencies \* \* \* nor to any businesses or transactions exempted from taxation under the constitution of the United States \* \* \*." Laws 1934, Sp.Sess. c. 7, § 202.

This court stated in the Gallup American Case:

"We think it quite unnecessary to conclude with exactitude just what is the object taxed. It may be that in the case of mining the excise is not strictly to be classified as a sales tax. In a large measure, however, it is sales that give birth

to the tax and sales that determine its amount. * * *

"The miner may produce indefinitely, storing his product, without becoming amenable to this taxation. When he sells a single ton there is an instantaneous application of this statute, according to a fixed rate applied to the price received. The total of a month's sales makes up the gross receipts. * * *

"This comprehensive revenue measure may in some of its incidents be a variance from the simple sales tax. When strict classification shall be called for, we may put it or parts of it in other category or categories. Its dominant feature, however, as to those who sell, is that for each sale there is an accession of revenue. Whether we consider the particular language used or the intent to be gathered from the nature of the tax, we conclude that sales to agencies of the United States are not to be included in the aggregate gross receipts upon which the tax is to be computed."

It is obvious that we did not determine the nature of this tax in that case. The Arizona court has said that it was not impressed with the reasons stated for our conclusion, though its conclusion—based on different reasons— was the same. Arizona State Tax Comm. v. Frank Harmonson Co., 63 Ariz. 452, 163 P.2d 667.

The price of gold is fixed under executive orders of the President and rules and regulations provided by the Gold Reserve Act of 1934. The only market for New Mexico gold is the United States Mint at Denver, Colorado. The appellant must ship its gold to that mint and accept the price paid therefor.

We have recently had occasion to consider this question (Albuquerque Broadcasting Co. v. Bureau of Revenue, 51 N.M. 332, 184 P.2d 416), and after a review of recent decisions of the United States Supreme Court, concluded that no state can tax the gross receipts from interstate communications and transportation, or levy any other direct tax upon interstate commerce.

The fact that gross receipts from interstate commerce are factors used in calculating the tax does not necessarily label it a direct tax laid upon the sale, or upon interstate commerce. The Supreme Court of the United States has, in many cases, upheld such tax, as constitutional, in that it did not unduly burden interstate commerce, Western Live Stock v. Bureau of Revenue, 303 U.S. 250, 58 S.Ct. 546, 82 L. Ed. 823, 115 A.L.R. 944; Wisconsin & M. R. Co. v. Powers, 191 U.S. 379, 24 S.Ct. 107, 48 L.Ed. 229; Maine v. Grand Truck R. Co., 142 U.S. 217, 12 S.Ct. 121, 163, 35 L.Ed. 994; Cudahy Packing Co. v. Minnesota, 246 U.S. 450, 38 S.Ct. 373, 62 L.Ed. 827; Postal Telegraph-Cable Co. v. Adams, 155 U.S. 688, 15 S.Ct. 360, 39 L.Ed. 311;

while in other cases it has been held unconstitutional because not fairly apportioned between local and interstate commerce, Meyer v. Wells Fargo & Co., 223 U.S. 298, 32 S.Ct. 218, 56 L.Ed. 445; Seelig v. Baldwin, 294 U.S. 511, 55 S.Ct. 497, 79 L.Ed. 1032, 101 A.L.R. 55, or in other respects unfair to interstate commerce.

If the tax in question is a direct tax on interstate commerce, it is void. On the other hand if it is not and it does not unduly burden interstate commerce, it is a valid exaction for the privilege of mining.

The tax, as the act states, is a privilege tax measured by the amount or volume of business done on account of the appellant's activities in the business of mining gold and silver. It is based upon the value of its entire production in this state, regardless of the place of sale or the fact that delivery may be made to points outside the state. The value as a basis for the tax, is the amount of gross receipts therefrom, whether or not the product is sold in New Mexico or elsewhere; and in this case it must be sold in Denver, Colorado. It is not a direct tax on the gold or its transportation in commerce. Its validity, therefore, depends upon whether it unduly burdens interstate commerce. It was stated in Western Live Stock v. Bureau of Revenue, supra [303 U.S. 250, 58 S.Ct. 549]:

"* * * Taxation measured by gross receipts from interstate commerce has been sustained when fairly apportioned to the commerce carried on within the taxing state (citations) and in other cases has been rejected only because the apportionment was found to be inadequate or unfair, * * * Whether the tax was sustained as a fair means of measuring a local privilege or franchise * * *, or as a method of arriving at the fair measure of a tax substituted for local property taxes * * * it is a practical way of laying upon the commerce its share of the local tax burden without subjecting it to multiple taxation not borne by local commerce and to which it would be subject if gross receipts, unapportioned, could be made the measure of a tax laid in every state where the commerce is carried on."

The gold itself cannot be taxed, nor is its value affected by the tax. When it reaches its destination it is held by the United States as purchaser until accepted and paid for. It cannot be taxed for any purpose in Colorado, or in New Mexico, for that matter. The statute does not discriminate against interstate commerce; nor is there in it any of the vices that have condemned such statutes as violating the Commerce Clause. We are of the opinion that the facts of this case bring it within Oliver Iron Co. v. Lord, 262 U.S. 172, 43 S.Ct. 526, 528, 67 L.Ed. 929, 930. The statute of Minnesota involved in that case provided that:

"Every person engaged in the business of mining or producing iron ore or other ores in this state shall pay to the state of Minnesota *an occupation tax* equal to 6 per cent. of the valuation of all ores mined or produced * * *." Laws Minn. 1921, c. 223, § 1.

In determining the value for taxation, the reasonable cost of separating the ore from the ore body, royalties paid, and a percentage of the ad valorem taxes levied against the mining property were substracted from the value of the ore, which was determined by the Minnesota Tax Commission, from the information which it was authorized to require, covering the activities of the company. In this case it was stated:

"We think the tax in its essence is what the act calls it,—an occupation tax. It is not laid on the land containing the ore, nor on the ore after removal, but on the business of mining the ore, which consists in severing it from its natural bed and bringing it to the surface where it can become an article of commerce and be utilized in the industrial arts. Mining is a well-recognized business wherein capital and labor are extensively employed. This is particularly true in Minnesota. Obviously a tax laid on those who are engaged in that business, and laid on them solely because they are so engaged, as is the case here, is an occupation tax. * * *

"The chief contention is that mining as conducted by the plaintiffs, if not actually a part of interstate commerce, is so closely connected therewith that to tax it is to burden or interfere with such commerce, which a state cannot do consistently with the commerce clause of the Constitution of the United States.

"* * * Practically all of their output is mined to fill existing contracts with consumers outside the state and passes at once into the channels of interstate commerce. * * * Steam shovels sever the ore from its natural bed and lift it directly into the cars. When loaded the cars are promptly returned to the railroad yards, where they are put into trains which start the ore on its interstate journey. The several steps follow in such succession that there is practical continuity of movement from the time the ore is severed from its natural bed. * * * plainly the facts do not support the contention. Mining is not interstate commerce, but like manufacturing, is a local business, subject to local regulation and taxation. * * * Its character in this regard is intrinsic, is not affected by the intended use or disposal of the product, is not controlled by contractual engagements, and persists even though the business be conducted in close connection with interstate commerce. * * *

"The ore does not enter interstate commerce until after the mining is done, and the tax is imposed only in respect of the mining. No discrimination against interstate commerce is involved. The tax may

indirectly and incidentally affect such commerce, just as any taxation of railroad and telegraph lines does, but this is not a forbidden burden or interference."

This was a decision by a full court. In a dissenting opinion in a subsequent case (Pennsylvania v. West Virginia, 262 U.S.553, 43 S.Ct. 658, 666, 67 L.Ed. 1117, 32 A.L.R. 300) Mr. Justice Holmes said:

"In Oliver Iron Min. Co. v. Lord, May 7, 1923, 262 U.S. 172, ante, 43 S.Ct. 526, 67 L.Ed. [929], it was held that the state might levy an occupation tax upon the mining of iron ore equal to 6 per cent. of the value of the ore produced during the previous year, although substantially all the ore left the State and was put upon cars for that purpose by the same single movement by which it was severed from its bed. There could not be a case of a State's product more certainly destined to interstate commerce. It was put upon the cars by the same act by which it was produced. But as it was not yet in interstate commerce the tax was sustained."

This case was referred to with approval in the concurring opinion of Mr. Justice Frankfurter in Independent Warehouses Corp. v. Scheele, 331 U.S. 70, 67 S.Ct. 1062, 1073, in which he said:

"* * * And so, this Court has sustained a tax upon the mining of ore although substantially all the ore left the State and was put upon cars for that purpose by the same act by which it was produced. Oliver Iron Min. Co. v. Lord, 262 U.S. 172, 43 S.Ct. 526, 67 L.Ed. 929, Mr. Justice Holmes joined in that opinion although 'There could not be a case of a State's product more certainly destined to interstate commerce.'"

This reference was to Pennsylvania v. West Virginia, supra, in which Mr. Justice Holmes dissented. The Minnesota tax was denominated an occupation tax, and the Supreme Court accepted this as correct. Some courts have distinguished between privilege and occupation taxes (Thompson v. Wiseman, 189 Ark. 852, 75 S.W.2d 393), but we are not able to find any substantial difference between the Minnesota and New Mexico taxes. Except in name the one difference is the fact that the taxable value in the Minnesota case is arrived at by deducting from the gross value the cost of separating the ore from the ore body, royalties and a percentage of the ad valorem taxes on the mining property. The value for taxing purposes is by no means the net income from mining, as there necessarily are many expenses incident to the business that are not deductible in determining taxable value. It is known before the ore is mined that it is destined for interstate commerce. It is taken from its natural bed and lifted into cars and started immediately into interstate commerce, a continuity of move-

ment from the lifting of the ore from its bed until it arrives in another state.

It is obvious that the only means of determining value for taxation is the sale price in interstate commerce less the items authorized to be deducted. It was the conclusion of the court that the tax was imposed with respect to the business of mining and that it was not an undue burden on interstate commerce.

The statement of the court could be applied to the New Mexico tax with perfect exactitude. The New Mexico tax is not laid on the land or the ore, nor on the ore after removal, nor on the gold after it is processed. In fact, the New Mexico mining is not so closely related to interstate commerce.

The mining business taxed, is a local business, subject to local regulation and taxation. Its character is not affected by the fact that the refined product is destined to be shipped to another state. The gold does not become an article of interstate commerce until after the mining is done, and the person engaged in it is subject to the tax. There is no discrimination against interstate commerce; and it cannot be taxed in another state.

The court's statement in the Minnesota case can be applied to this case without the change of a word and be exact, to-wit [262 U.S. 172, 43 S.Ct. 529]:

"The ore does not enter interstate commerce until after the mining is done, and

the tax is imposed only in respect of the mining. No discrimination against interstate commerce is involved. The tax may indirectly and incidentally affect such commerce, just as any taxation of railroad and telegraph lines does, but this is not a forbidden burden or interference."

There is no competitive market for gold. It can be sold only to the United States or under its authority. The tax does not affect its cost to the United States or any authorized purchaser. The sole effect is to add to its production cost, as any tax on gold mines, or the business of mining gold would add to such cost.

We fail to see that this tax unduly affects interstate commerce.

It is said that under the doctrine of McCulloch v. Maryland, 4 Wheat. 316, 4 L.Ed. 579, the tax is void because it is a tax upon the United States or its instrumentalities.

There are several reasons why this is not correct, the principal one being that no tax is laid upon the gold, nor is the United States affected by it. The cost to the United States is fixed, and the price not varied by state taxes or by any other incident. The appellant cites the case of Panhandle Oil Co. v. Mississippi, 277 U.S. 218, 48 S.Ct. 451, 72 L.Ed. 857, 56 A.L.R. 583. The question there decided was whether oil sold directly to the United States Navy for use in war was subject to a state tax

levied upon each gallon sold; and by a five to four decision (four of the Court's ablest justices, Holmes, Brandeis, Stone and McReynolds, dissented) it was held void. This was followed by Graves v. Texas Co., 298 U.S. 393, 56 S.Ct. 818, 822, 80 L.Ed. 1236, which held that a storage tax upon gasoline sold to the United States was void for the same reason. These cases are cited upon the assumption that the gold in question was taxed. As we have held that the tax was upon the privilege of mining, they have no application. In the Graves Case the reason for the ruling was stated as follows:

"The validity of the tax is to be determined by the practical effect of enforcement. To apply any other test of constitutionality would be to treat 'a prohibition, which is general, as if it were confined to a particular mode of doing the forbidden thing.' * * * 'It is immaterial that the seller and not the purchaser is required to report and make payment to the State. * * * The amount of money claimed by the State rises and falls precisely as does the quantity of gasoline so secured by the government. It depends immediately upon the number of gallons.' "

The cost of gold to the United States is not affected by the tax. It should be stated, however, that these cases were in effect, if not directly, overruled in Alabama v. King & Boozer, 314 U.S. 1, 62 S. Ct. 43, 45, 86 L.Ed. 482.

The state of Alabama had levied a tax upon the gross retail sales of all tangible property. King & Boozer had contracted with the United States to construct certain buildings necessary for war purposes, at a cost plus consideration. They contracted for lumber to be used in the construction. It was contended that as the lumber was necessarily paid for by the United States that the sale could not be taxed. In holding that the tax was valid the court said:

"* * * So far as such a nondiscriminatory state tax upon the contractor enters into the cost of the materials to the Government, that is but a normal incident of the organization within the same territory of two independent taxing sovereignties. The asserted right of the one to be free of taxation by the other does not spell immunity from paying the added cost, attributable to the taxation of those who furnish supplies to the Government and who have been granted no tax immunity. So far as a different view has prevailed, see Panhandle Oil Co. v. Miss., supra; Graves v. Texas Co., supra, we think it no longer tenable."

It is next asserted that the tax imposed constitutes a burden upon, and an interference with, the United States' authority to coin money, regulate the value thereof, etc.

We fail to understand just how this tax can possibly interfere in the manner sug-

gested. Gold itself cannot be taxed, and has not been. It must be delivered to the United States, or as by it directed, and at a specified price, irrespective of its cost to the producer. The various laws, orders and regulations copied in appellant's brief do not convince us that there is any merit in this contention. If it were true, gold mines are immune from ad valorem taxation and privilege and occupation taxes cannot be levied against the owners of such mines. In other words, that industry is immune from taxation.

The state has not been deprived of its power to tax gold mines or their owners by the Gold Reserve Act, or by Sec. 8 of Article I of the Constitution of the United States, as appellant asserts.

The last point relied on for reversal is that if appellant is subject to this tax, it should be at the rate of ¼ of 1% rather than at ½ of 1%, for the reason that the Legislature, in the passage of Senate Committee Substitute for Senate Bill No. 149, at the 1941 Session, violated the provisions of section 15 of article 4 of the Constitution of New Mexico, in that said original Senate Bill was so altered and amended by the passage of the committee substitute therefor as to change its original purpose.

The pertinent part of article 4, section 15 of the New Mexico Constitution reads as follows:

"No law shall be passed except by bill, and no bill shall be so altered or amended on its passage through either house as to change its original purpose. * * *"

Appellant does not cite any authority in support of this contention.

The purpose of Senate Bill No. 149, as introduced and finally passed, may be found in the title, which reads as follows:

"To provide for the raising of revenue for emergency school purposes by imposing an excise tax upon the engaging or continuing in business, profession, trades and callings for profit in this state; providing for the levy, assessment and collection of said tax; prohibiting direct advertisement of non-collection of receipts from rentals or leasing of tangible personal property; fixing status of sale to manufacturers and others; providing for resale certificates by purchasers under certain circumstances and providing penalties for misuse; providing for certain protest payments; limiting time within which re-audit may be made; giving power to administer oaths and compel testimony to the Commissioner of Revenue and the Director of the School Tax Division of the Bureau of Revenue; authorizing orders and rulings and amending Section 2 of Chapter 192 of the Session Laws of 1937, Section 3 of Chapter 192 of the Session Laws of 1937, Section 209 of Chapter 73 of the Session Laws of 1935, Section 211 of

Chapter 73 of the Session Laws of 1935, Section 313 of Chapter 73 of the Session Laws of 1935, and Section 319 of Chapter 73 of the Session Laws of 1935."

Senate Committee substitute for Senate Bill No. 149 states its purpose in exactly the same language as the original bill with the exception that certain additions were made and certain descriptive, but unnecessary, words were dropped from the title.

Many other states have identical provisions to that appearing in Article 4, Section 15, of our Constitution; and, while this specific provision of our Constitution has never been passed on by this court, it has been before the courts of many other states having similar provisions. The Supreme Court of Montana passed upon a similar constitutional provision in the case of State ex rel. Griffin v. Greene et al., reported in 104 Montana, 460, 67 P.2d 995, 997, 111 A.L.R. 770, and the court stated:

"As originally introduced, the body of the bill was identical with the bill as finally enacted, except, first, that, as originally introduced, the amount of the fee varied according to the population of the city in which the theater was operated and according to the number of theaters under the same general management, supervision, or ownership; second, as originally introduced, the bill provided that the fees 'shall be paid annually'; as finally passed, the same provision that the fees 'shall be paid annually'

was still in the act, but immediately followed by a provision that they shall be paid quarterly. The body of the bill, as originally introduced, as well as that of the act as finally passed, deal with movie theaters. It is plain that the original purpose of the bill as introduced was to impose a license tax on moving picture theaters. That purpose was preserved and carried out in the bill as finally enacted. The amount of the tax and the time when payable is all that was changed in the bill as originally introduced. There was no departure from the prohibition contained in section 19, article 5, of the Constitution."

The purpose of Senate Committee Substitute for Senate Bill No. 149 was to meet an existing emergency in regard to public schools of the state, and to provide funds for the proper maintenance and support of said schools. The original purpose of the bill was preserved in the act, but the amendment only increased the amount of tax to be paid from ¼ of 1% to ½ of 1% on the gross receipts.

It is true that said Act as finally adopted is much broader than the bill as originally introduced, and much more comprehensive as to details; but we do not believe that the purpose of the bill was so changed as to violate article 4, section 15 of the Constitution. One of the main purposes of the bill as introduced was to increase the rate of taxes for the privilege of doing a mining business,

and to include other commodities therein; and the bill as passed simply broadens the scope and purpose. We therefore hold that the amendments, or changes, were mere extensions, or related details, and did not change the general purpose of the bill.

The Supreme Court of the State of Alabama has passed on a similar question several times, and in State Docks Commission v. State, 227 Ala. 521, 150 So. 537, 547, the validity of the act there under consideration was challenged as violative of that section of the Alabama Constitution which provides that "no bill shall be so altered or amended on its passage through either house as to change its original purpose." Const.Ala. 1901, § 61. The court in holding that the amendment did not violate the provisions set out, said:

"The 'purpose' of the bill contemplated in section 61 of the Constitution is the *general purpose of the bill and not the mere details through which and by which that purpose is manifested and effectuated.* The amendments were merely extensions and not changes of purpose. * * * In our opinion, the purpose of the bill was never changed throughout its passage in either house." (Emphasis ours.)

█ The purpose of Article 4, Section 15 of the New Mexico Constitution prohibiting the altering or amending a bill on its passage so as to change its purpose is, solely to prohibit amendments not germane to subject of legislation expressed in the title of act purported to be amended.

See Stein v. Leeper, 78 Ala. 517; Hall v. Steel, 82 Ala. 562, 2 So. 650; Alabama State Bridge Corp. v. Smith, 217 Ala. 311, 116 So. 695.

The Supreme Court of the State of Arkansas, which state also has a similar provision in its constitution as ours, passed upon this question in the case of Loftin v. Watson, 32 Ark. 414, and in upholding the validity of the act, stated:

"The purpose of the bill was to make county warrants, etc., receivable in payment of county taxes and debts, without regard to the dates of such warrants, or the purposes for which they were issued. *The original purpose of the bill was preserved in the act,* but the amendments made by the two houses limited the scope of the bill, by exceptions, and extended it so as to embrace city warrants, etc., with like exceptions." (Emphasis ours.)

A similar question to the one at bar was submitted to the Supreme Court of Colorado by the House of Representatives in the case of in re Amendments of Legislative Bills, 19 Colo. 356, 35 P. 917. The bill evidently was for the purpose of reducing the penalties and interest on delinquent taxes to one half the present rates. By amendments certain provisions of the bill were extended. The Court held that, not withstanding the amendments, the

original purpose of the bill was not changed and stated as follows:

"The house bill seeks to attain the object by amending a designated section of the revenue act. By the senate amendments the same object is sought by amendments to this and other sections of the same act. While by these amendments the provisions of the original bill are extended, the designated subject of legislation has been kept clearly in mind, and the original purpose of the bill in no manner changed."

Also see People v. United Mine Workers of America, 70 Colo. 269, 201 P. 54; Airy v. People, 21 Colo. 144, 40 P. 362; Massachusetts Mutual Life Insurance Co. v. Colorado Loan & Trust, 20 Colo. 1, 36 P. 793.

We conclude that there was no such alteration by the amendment as to change the original purpose of the bill within the meaning of Article 4, Section 15 of the New Mexico Constitution, and the court properly sustained the demurrer to paragraph No. 7 of the complaint.

Finding no error, the judgment appealed from must be affirmed. It is so ordered.

BRICE, C. J., and COMPTON, J., concur.

SADLER, Justice (dissenting).

"*None of the taxes levied by this act shall be construed to apply to sales made to the government of the United States or any agency or instrumentality thereof,* except a corporate agency or corporate instrumentality, nor to sales to the state of New Mexico or any of its political subdivisions; *provided that depsoits of gold and silver with the United States' mint shall not be considered as sales to the government of the United States and shall not be exempt hereunder;* nor shall such taxes apply to any businesses or transactions exempted from taxation under the Constitution of the United States or the state of New Mexico." 1941 Comp., § 76-1405. (Italics added.)

The language underscored first above, denying application of the taxes levied to sales made to the government of the United States, or any agency or instrumentality thereof, is not ambiguous. It requires no construction and means what it plainly states. The prevailing opinion cannot and, indeed, does not dispute that the transaction in question is a sale. So viewed, this should end the matter and eliminate the proceeds of same from use in calculating the tax. Especially is this true since no reliance can be based on the proviso declaring "that deposits of gold and silver with the United States' mint shall not be considered as sales to the government of the United States and shall not be exempt" under the act. The prevailing opinion makes no effort to support a distinction between deposits of gold with the mint and sales to the mint,

specifically exempted by the act itself. Indeed, it states whether the transaction is a mere deposit or a sale, "is beside the question."

The majority, willingly or not, must accept the transaction for what it is—a "sale." They even cite authority holding it is in effect a sale. Walling v. Haile Gold Mines, 4 Cir., 136 F.2d 102. They argue, however, that in as much as this is not strictly a sales tax but rather a privilege tax, it can be sustained even though the amount of the tax is augmented by *sales* to an agency or instrumentality of the United States. Since the function of the sale as one merely to augment the amount of the tax and the character of the tax as one for the privilege of carrying on the business of mining, both were well known to the legislature, why then was the language first underscored above placed in the act? It was an idle gesture to do so if its plain mandate may be avoided in the manner employed by the majority.

Of course, this language of immunity was incorporated to avoid the patent constitutional objection that one sovereignty may not tax another, its agencies or instrumentalities, without the other's consent. If the act does the very thing the questioned language was designed to prevent, then does not the statute again become subject to the constitutional barrier it was employed to surmount? Obviously so.

The language of the *proviso* was added by amendment in 1941, L.1941, c. 133, § 1, in an apparent effort to take away the immunity given in so far as the same might arise from a sale of gold or silver. The identical language of this *immunity* as found in L.1934 (Sp.Sess.) c. 7, § 202, was construed in Gallup American Coal Co. v. Beall, 39 N.M. 188, 43 P.2d 927. The act was a predecessor of L.1935, c. 73, and imposed a privilege tax on mining companies as well as other persons and corporations for the privilege of doing business. The same contention was made there as here, namely that since the tax is upon the privilege of carrying on business and not upon the sale, the immunity claimed is untenable. The court ruled against this contention and, among other things, said:

"Here is a plain provision that none of the taxes levied by the act (including certainly the tax of one-fourth of one per cent. on the gross receipts of coal mining) shall apply to sales made to the government of the United States, or any of its departments or agencies. Yet it is claimed by the state that in order to interpret this provision we must first determine the exact character of this excise; that we will find it not to have been laid upon any sale, nor upon gross receipts, but upon the privilege or business of coal mining; and that consequently the exempting language is inappropriate and inapplicable. * * *

"This comprehensive revenue measure may in some of its incidents be a variance from the simple sales tax. When strict classification shall be called for, we may put it or parts of it in other category or categories. Its dominant feature, however, as to those who sell, is that for each sale there is an accession of revenue. *Whether we consider the particular language used or the intent to be gathered from the nature of the tax, we conclude that sales to agencies of the United States are not to be included in the aggregate gross receipts upon which the tax is to be computed.*

"We therefore find appellant's first claim of error to be well taken." (Italics added.)

The majority notice this case and obviously overrule it in the opinion filed. They attempt to justify the contrary holding by asserting that the statute there construed has since been materially amended. They are challenged to point out a single respect in which it has been amended, *material* to the present controversy. The legislative fiat carried in L.1941, c. 133, § 1, 1941 Comp. § 76-1405, declaring a sale to the government shall not be deemed a sale—certainly, this cannot be intended as the "material" amendment spoken of. If so, it is wholly inocuous.

Transparency of the majority's effort to impute a state of indecision to the legislature as to whether the transaction in-volved constitutes a sale; and to explain the statutory declaration it was not to be deemed a "sale" as a mere legislative re-solving of a doubtful question, readily ap-pears when we read the cases cited to sup-port the speculation indulged, namely, Hol-land v. Haile Gold Mines, D.C., 44 F.Supp. 641, and Fox v. Summit King Mines, D. C., 48 F.Supp. 952. An examination of these cases discloses a holding that the acquisition of the gold by the government, if deemed a commercial transaction at all, would appear to be an "administrative act" of the government rather than a "ship-ment in commerce" by the defendant min-ing company. In other words, the court was concerned in determining whether the Company, engaged in gold mining in South Carolina, in sending its gold where the government might direct, as required by the Gold Reserve Act, was "engaged in interstate commerce"—not, as the ma-jority would seek to persuade, whether the transaction, when completed, constitut-ed a "sale."

The prevailing opinion cites and places some reliance upon the case of Arizona State Tax Commission v. Frank Harmon-son Co. Metal Products, 63 Ariz. 452, 163 P.2d 667, 669. That the Supreme Court of Arizona in its opinion in this case, con-sidered our holding in Gallup American Coal Co. v. Beall, supra, definitely opposed to theirs in the case mentioned, is demon-

strated by the following language in its opinion, to-wit:

"Under provisions similar to our statute, the supreme court of New Mexico came to the conclusion that 'the proceeds of sales to the United States, as reflected in the gross income of the taxpayer, should be eliminated for tax purposes. Gallup American Coal Co. v. Beall, 39 N. M. 188, 43 P.2d 927. We are not impressed with the reasons stated in that case in support of the conclusion."

Plainly, the Arizona court does not approve of our reasoning in the Beall case. It is needless to add that in reaching the conclusion we did in that case we rejected the reasoning relied upon by it in the case just quoted from. Seemingly, the majority in the case at bar have been persuaded to give the reasoning of the Arizona case a belated acceptance. It is worth mentioning that the opinion of a California Court of Appeals in M. G. West Co. v. Johnson, 20 Cal.App.2d 95, 66 P.2d 1211, accords with the opinion of this court in Gallup American Coal Co. v. Beall, supra. Cf. Albuquerque Broadcasting Co. v. Bureau of Revenue, 51 N.M. 332, 184 P.2d 416; Landis v. Ormsbee, 51 N.M. 358, 184 P.2d 433.

If the mere circumstance that the tax involved is a privilege tax imposed for engaging in business in New Mexico could make any difference, as already indicated, it was known to the legislature to be such when it incorporated the language exempting application of the tax to sales "made to the government of the United States or any agency or instrumentality thereof," etc. Accordingly, it was a futile and meaningless thing to employ such language if its effect was to be nullified by some magic inhering in its designation as a "privilege" tax.

"To use the number of gallons (of gasoline) sold the United States as a measure of the *privilege tax* is in substance and legal effect to tax the sale." (Emphasis mine). Panhandle Oil Company v. Mississippi, infra.

Nor is the immunity thus granted in any way qualified in scope by the absence of injury in the application of the tax to sales to the government of the United States or its agencies. If the legislature had intended thus to restrict the exemption extended, it would have employed language appropriate to that end. The only exception is sales to "a corporate agency or corporate instrumentality" of the United States—not sales to the United States, "if injured" thereby. It is worthy of note, too, that decisions of the United States Supreme Court place no such limitation on the immunity of the United States, its agencies and instrumentalities, from state taxation by confining it to cases where injury to the sovereign taxed can be shown. The decisions simply hold the sovereign, its agencies and instrumentalities, shall not

be taxed. Panhandle Oil Company v. State of Mississippi, 277 U.S. 218, 48 S.Ct. 451, 453, 72 L.Ed. 857. See, also, annotations of questions involved in 56 A.L.R. 587, supplemented in 140 A.L.R. 621.

In my opinion the judgment should be reversed and the cause remanded with a direction to the trial court to award recovery of the amount of the tax paid under protest and for further proceedings not inconsistent with the views herein expressed. Convinced, as I am, that the amount of appellant's tax may not be augmented by including in the calculation of same the proceeds of sales of gold to the United States' mint, I withold opinion on several other questions resolved in the majority opinion and interposed by appellee as obstacles to recovery by appellant of the tax paid.

I dissent.

McGHEE, J., concurs.